918 P.2d 1038

**STATE of Arizona, Appellee,**

v.

**Levi Jaimes JACKSON, Appellant.**

**No. CR–94–0045–AP.**

Supreme Court of Arizona, En Banc.

May 3, 1996.

Grant Woods, Attorney General by Paul J. McMurdie, Chief Counsel, Criminal Appeals Section, Monica D. Beerling, former Attorney General, Phoenix, for the State of Arizona.

Harriette P. Levitt, Tucson, for Levi Jaimes Jackson.

OPINION

MARTONE, Justice.

Levi Jackson was convicted of first degree murder, one count of dangerous kidnapping, and one count of dangerous armed robbery. The trial court sentenced him to death for the murder and to prison terms for the non-capital convictions. Appeal to this court is automatic. *See* Rules 26.15 and 31.2(b), Ariz. R.Crim.P.; A.R.S. § 13–4031. We affirm the convictions and sentences.

*FACTS*

On December 7, 1992, Patricia Baeuerlen drove out of her apartment complex and stopped at the corner of 24th Street and Columbus Avenue in Tucson. Jackson, Kevin Miles, and Ray Hernandez were standing near the stop sign. Jackson approached her car and asked her for a "light." Tr. Jan. 19, 1994 at 44. As she looked away, Jackson pulled out a gun, pointed it at her and ordered her to "scoot over." *Id.* Jackson, Miles, and Hernandez then got into the car.

Jackson drove to a desert area on the southeast side of Tucson. When they stopped, Jackson ordered the victim out of and away from the car. Several minutes later, Jackson shot her. She died from a gunshot wound to the heart.

*ISSUES PRESENTED*

Jackson raises the following issues:

**A. Trial Issues**

1. Did the trial court erroneously allow the state to file its formal notice of intent to seek the death penalty 1 day late?

2. Is it unconstitutional to sentence a 16–year–old to death?

3. Did the trial court err in denying defendant's motion to change venue?

4. Did the trial court erroneously admit evidence of defendant's desire to be in a gang?

5. Did the trial court err in denying defendant's Rule 404(b) motion?

6. Should the trial court have instructed the jury on lesser included offenses?

7. Should the trial court have defined reasonable doubt for the jury?

8. Should the trial court have given an interrogatory to the jury on the theories of first degree murder?

9. Did the trial court coerce the jury?

10. Did the trial court err in failing to disclose the foreperson's letter?

**B. Sentencing Issues**

1. Was the murder committed in an especially cruel manner (A.R.S. § 13–703(F)(6))?

2. Was the murder committed in a heinous or depraved manner (A.R.S. § 13–703(F)(6))?

3. Was the murder committed in expectation of pecuniary gain (A.R.S. § 13–703(F)(5))?

4. Did the trial court err in finding that the age of the defendant coupled with his abusive and dysfunctional family background did not outweigh the aggravating circumstances?

5. Was co-defendant Hernandez's sentence so disparate to that of Jackson's that it violated the Eighth Amendment?

6. Is Arizona's death penalty statute constitutional?

### TRIAL ISSUES

**1. Untimely Filing Under Rule 15.1(g)(1), Ariz.R.Crim.P.**

Rule 15.1(g)(1), Ariz.R.Crim.P., requires the state to provide the defendant notice of intent to seek the death penalty no later than 30 days after arraignment. At pretrial proceedings, the state admitted it had missed the 30–day deadline by 1 day, "due to no excusable neglect." Tr. Apr. 15, 1993 at 5. Jackson argues that the trial court committed reversible error by allowing the state to file its notice 1 day late. We disagree.

■ Rule 15.7, Ariz.R.Crim.P., is the starting point for our analysis. See Rule 15.1(g)(4), Ariz.R.Crim.P. Under Rule 15.7, the trial court "may impose" a variety of sanctions "which it finds just under the circumstances." The imposition and choice of sanction are within the discretion of the trial court. *State v. Tucker,* 157 Ariz. 433, 439, 759 P.2d 579, 585 (1988). We do not disturb the trial court's ruling unless the defendant can show prejudice and an abuse of discretion. *Id.*

■ Jackson suffered no prejudice here. In granting the state's motion to enlarge the filing time, the trial court considered the circumstances surrounding the prosecutor's violation and the prejudice to Jackson. The trial court found that Rule 15.1(g)(1) is designed to give the defendant notice of the state's intent to seek the death penalty sufficiently in advance to adequately prepare a defense. At least a week before the state's notice was due, Jackson was aware of the prosecutor's intent to seek the death penalty.[1] Jackson had close to five months from the time of formal notice to prepare for trial. The trial court's decision to allow the state to file its notice of intent 1 day late was not an abuse of discretion. *See State v. Salazar,* 173 Ariz. 399, 405, 844 P.2d 566, 572 (1992), *cert. denied,* 509 U.S. 912, 113 S.Ct. 3017, 125 L.Ed.2d 707 (1993) (defense not prejudiced

by state's failure to list expert witness on witness list where repeated references to expert being called as a witness were made in open court).

Jackson also argues that Rule 15.1(g)(1) acts as a statute of limitations, and therefore the state's failure to strictly comply with the rule divested the trial court of jurisdiction over the capital case. This argument is without merit.

**2. Constitutionality of Sentencing a 16–Year–Old Defendant to Death**

■ Jackson argues that the death penalty in this case is unconstitutional in three respects. He first argues that the imposition of the death penalty upon a 16–year–old constitutes cruel and unusual punishment under the Eighth Amendment to the United States Constitution.

Whether a sentence violates the Eighth Amendment depends upon society's views of the challenged punishment as expressed by objective evidence. "First among the 'objective indicia that reflect the public attitude towards a given sanction' are statutes passed by society's elected representatives." *Stanford v. Kentucky,* 492 U.S. 361, 370, 109 S.Ct. 2969, 2975, 106 L.Ed.2d 306 (1989) (plurality opinion). After concluding that a majority of states that had capital punishment authorized the execution of 16–year–olds, *Stanford* upheld the imposition of the death penalty on a person who was 16 at the time of the murder. *Id.* at 373, 109 S.Ct. at 2977.

Jackson argues that the national consensus has changed since 1989. But he has a "heavy burden" to establish a national consensus against the imposition of the death penalty on a 16–year–old. *Id.* The evidence does not support his claim.

In 1989, of the 36 states that imposed capital punishment, 14 excluded 16–year–olds, 13 states included them, and 9 states set no minimum age requirement. Capital Punishment 1989, Bureau of Justice Statistics Bulletin 5, Table 3. In 1993, when Jack-

---

1. The state was required to file its notice of intent to seek the death penalty by April 5, 1993. On March 24, 1993, Jackson filed a motion to find extraordinary circumstances justifying the suspension of Rule 8, Ariz.R.Crim.P. On April 1, 1993, Jackson argued in open court that an extraordinary circumstance in the case was the state's intent to seek the death penalty.

son was sentenced to death, of the 36 states that imposed capital punishment, 15 excluded 16–year–olds, 12 included 16–year–olds, and 9 states set no minimum age requirement. Capital Punishment 1993, Bureau of Justice Statistics Bulletin 6, Table 3. The decline of 1 state is not a change in the national consensus. *Id.* at 370, 109 S.Ct. at 2975; *see Coker v. Georgia*, 433 U.S. 584, 595–96, 97 S.Ct. 2861, 2867–68, 53 L.Ed.2d 982 (1977) (in invalidating the death penalty for the rape of an adult woman, Court stressed that Georgia was the only jurisdiction that authorized such a punishment); *Solem v. Helm*, 463 U.S. 277, 300, 103 S.Ct. 3001, 3015, 77 L.Ed.2d 637 (1983) (in striking down life sentence without parole under recidivist statute, Court emphasized that defendant was treated more severely than he would have been in any other state).

Second, Jackson argues that Arizona's death penalty statute violates the Eighth Amendment because it fails to specify a statutory minimum age for execution. But, as Justice O'Connor noted, a state need not specify a minimum age when "it is clear that no national consensus forbids the imposition of capital punishment for crimes committed at such an age." *Stanford*, 492 U.S. at 380–81, 109 S.Ct. at 2981 (O'Connor, J., concurring). Arizona's death penalty statute need not specify a minimum age because "it is sufficiently clear that no national consensus forbids the imposition of capital punishment on 16–year–old capital murderers." *Id.*

Finally, Jackson argues that it is cruel and unusual to execute a 16–year–old under Article 2, Section 15 of the Arizona Constitution. We disagree. First, Arizona's constitutional prohibition against cruel and unusual punishment is "identically worded to its federal counterpart," *State v. Bartlett (I)*, 164 Ariz. 229, 240, 792 P.2d 692, 703 (1990), and at least as here, where the parties do not argue otherwise, we give them the same meaning. *Id.; see, e.g., State v. Taylor*, 160 Ariz. 415, 422–23, 773 P.2d 974, 981–82 (1989). Second, although this court has considered the age of an offender to be a substantial and relevant factor at sentencing, we have found "no constitutional authority or statutory provision [that] prohibits the sentencing of a 16–year–

old to death." *State v. Valencia*, 124 Ariz. 139, 141, 602 P.2d 807, 809 (1979).

### 3. Change of Venue

██ Jackson argues that the "car jacking" and the age of the defendants generated an overwhelming amount of pretrial publicity, and therefore the trial court should have granted his motion for change of venue.

"There is a two-step inquiry for pretrial publicity: (1) did the publicity pervade the court proceedings to the extent that prejudice can be presumed?; if not, then (2) did defendant show actual prejudice among members of the jury?" *State v. Stokley*, 182 Ariz. 505, 513, 898 P.2d 454, 462 (1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 787, 133 L.Ed.2d 737 (1996). To presume prejudice, Jackson must show pretrial publicity "so unfair, so prejudicial, and so pervasive that the [court] cannot give credibility to the juror's answers during voir dire." *State v. Bolton*, 182 Ariz 290, 300, 896 P.2d 830, 840 (1995).

The media coverage in this case was not pervasive or outrageous. Jackson offered a statistical survey in support of his motion for change of venue that showed that 61% of Pima County residents had knowledge of the "car jacking" incident. Of the respondents, 36% had formed an opinion about the guilt or innocence of the parties involved. Assuming without deciding the validity of the results, the fact that one-third of the respondents formed an opinion about the guilt or innocence of the parties is not the sort of evidence that would support a claim of "pervasive or outrageous" media coverage. We thus do not presume prejudice.

Nor has Jackson shown actual prejudice. An examination of voir dire fails to show such prejudice. We find no error.

### 4. Admission of Appellant's Desire to Join a Gang

██ Jackson argues that the trial court erred in allowing the state to offer evidence of his affiliation with a gang. He argues that this was improper character evidence and that even if it were offered for a proper purpose, there was no evidence that the crime was gang related. The state argues

that Jackson failed to object to gang affiliation evidence, and thus waived the issue. Alternatively, the state argues that the gang affiliation evidence was relevant to rebut Jackson's attempt to shift responsibility to Hernandez because he was a member of the "Crips" gang. Finally, the state argues that even if the evidence should have been excluded, it was harmless because the jurors would have convicted Jackson without the evidence.

The record, not perfect on this point, is as follows. Jackson apparently moved to preclude evidence of his gang affiliation before trial. But the written motion is not part of the record on appeal, and Jackson has made no attempt to supplement the record, despite having been informed that the motion is not part of the record. Nevertheless, the trial court heard oral argument on the motion. The state argued that it would not offer testimony that Jackson was affiliated with a particular gang, although it might offer testimony from Hernandez that Jackson wanted to join a gang and that this was a partial motive for the offense. Jackson indicated that he did not want to be heard on the motion. He did, however, inform the court that he was going to offer evidence of Hernandez's gang affiliation. The state objected to the evidence as not relevant because it was not a gang shooting. The trial court overruled the state's objection and allowed Jackson to offer evidence of Hernandez's gang affiliation as relevant to Hernandez's character. The trial court also ruled that the state would be permitted to introduce Jackson's interest in joining a gang, if it were otherwise relevant to motive.

The state did not mention anything about gang affiliation in its opening statement. But Jackson did. Jackson described two of the state's witnesses in the case as members of the "Crips" gang in an effort to discredit them. The state then offered, without objection, testimony that although Jackson was not in a gang, he was a "back up" for the "Crips." Tr. Sept. 22, 1993 at 43. The state tried to offer evidence that Jackson was a "wanna-be" gang member, but the court sustained the defendant's foundational objection and the state did not follow through. *Id.* at 203–06. Jackson also elicited evidence from Lonnie Bailey on cross examination that Jackson was not in the "Crips," but that he was "down" for them. Tr. Sept. 23, 1993 at 121.

Our review of the record suggests that it was Jackson, not the state, that thrust the question of gang membership into this case. Although the state never did tie up its evidence that Jackson wanted to be a member of a gang with motive in this case, of the two references to gang affiliation, Jackson offered one of them, and let the other one in without objection.

■ The trial judge's original ruling allowing the state to offer evidence of gang membership to prove motive was correct. Evidence of gang affiliation is admissible when it is relevant to a material issue in the case. *United States v. Abel*, 469 U.S. 45, 49, 105 S.Ct. 465, 470, 83 L.Ed.2d 450 (1984) (admissible to impeach for bias); *United States v. Easter*, 66 F.3d 1018, 1021 (9th Cir.1995), *cert. denied*, ── U.S. ──, 116 S.Ct. 1026, 134 L.Ed.2d 104 (1996) (admissible to show identity); *United States v. Santiago*, 46 F.3d 885, 889 (9th Cir.1995), *cert. denied*, ── U.S. ──, 115 S.Ct. 2617, 132 L.Ed.2d 860 (1995) (admissible to show motive for crime); *United States v. Fagan*, 996 F.2d 1009, 1015 (9th Cir.1993) (admissible to buttress policeman's ability to identify defendant). Although the state never did connect up gang affiliation with motivation, the defendant never objected on that basis. We therefore are of the view that the issue is waived.

In all events, in light of the overwhelming evidence of guilt in this case, the minimal evidence offered with respect to Jackson's association with a gang could not reasonably have contributed to the verdict against him. There was no error.

5. **Denial of Jackson's Rule 404(b) Motion: Evidence of Co–Defendant's Prior Bad Acts**

■ Jackson argues that the trial court erred by excluding evidence of co-defendant Miles's prior bad acts to prove the identity of the person who committed the kidnapping and murder.

Rule 404(b), Ariz.R.Evid., allows evidence of other crimes to prove identity, but "the modus operandi of and the circumstances surrounding the two crimes must be sufficiently similar" as to be like a signature. *State v. Brown,* 125 Ariz. 160, 161, 608 P.2d 299, 300 (1980); John W. Strong, *McCormick on Evidence* § 190, at 801–03 (4th ed. 1992).

Here, the crimes charged and Miles's prior armed robberies are not sufficiently similar to show that the trial judge abused his discretion in excluding this evidence. The record indicates that Miles pled guilty to three armed robberies that occurred before the kidnapping and murder in this case. Jackson argued at trial that this evidence proved that Miles, and not he, planned the abduction and murder. The similarities between Miles's three armed robberies and this case are: (1) the victims were women, and (2) in two of the armed robberies Miles used a semi-automatic weapon.

The differences, however, outweigh the similarities. First, the armed robberies did not involve a kidnapping. Second, no shots were fired, and no injuries occurred. Third, no vehicle was stolen or involved. We find no abuse of discretion.

### 6. Lesser Included Offense Instruction

 Jackson argues that the trial court erred in failing to give his requested instruction on the lesser included offense of second degree murder. We disagree.

 A lesser included offense instruction is proper only where the evidence supports such an instruction. *State v. Salazar,* 173 Ariz. 399, 408, 844 P.2d 566, 574 (1992), *cert. denied,* 509 U.S. 912, 113 S.Ct. 3017, 125 L.Ed.2d 707 (1993). "To determine whether there is sufficient evidence to require the giving of a lesser included offense instruction, the test is 'whether the jury could rationally fail to find the distinguishing element of the greater offense.'" *State v. Krone,* 182 Ariz. 319, 323, 897 P.2d 621, 625 (1995) (quoting *State v. Noriega,* 142 Ariz. 474, 481, 690 P.2d 775, 782 (1984)). Of course, there is no lesser included offense to felony murder. *State v. Landrigan,* 176 Ariz. 1, 5, 859 P.2d

111, 115 (1993), *cert. denied,* 510 U.S. 927, 114 S.Ct. 334, 126 L.Ed.2d 279 (1993).

At trial, the state proceeded on dual theories of felony murder and premeditated murder, and the jury convicted Jackson by general verdict. For a second degree murder instruction to be warranted, a jury would have to rationally conclude that premeditation was lacking. *Krone,* 182 Ariz. at 323, 897 P.2d at 625. Jackson claimed at trial that he was not responsible for the victim's death. He did not claim that he had killed her but lacked premeditation, nor does the record support such a finding. "Because defendant's theory of the case denies all involvement in the killing, and no evidence provides a basis for a second degree murder conviction, the instruction was properly refused. When the record is such that defendant is either guilty of the crime charged or not guilty, the trial court should refuse a lesser included instruction." *Salazar,* 173 Ariz. at 408, 844 P.2d at 574.

### 7. Failure to Define Reasonable Doubt

 Jackson argues that the trial court violated his right to due process by failing to define reasonable doubt for the jury.

The trial court explained to the jury that the state had charged Jackson with the crimes of first degree murder, robbery and kidnapping. The trial court then instructed the jury that "the state must prove every part of the charges beyond a reasonable doubt." Tr. Sept. 24, 1993 at 85. "[T]hough the trial court must always instruct that the prosecution must prove its case beyond a reasonable doubt, there is no requirement that a trial court define reasonable doubt for the jury." *State v. Bracy,* 145 Ariz. 520, 535, 703 P.2d 464, 479 (1985), *cert. denied,* 474 U.S. 1110, 106 S.Ct. 898, 88 L.Ed.2d 932 (1986).

Jackson filed a notice of supplemental authority in support his argument, citing *State v. Portillo,* 182 Ariz. 592, 596, 898 P.2d 970, 974 (1995) (setting forth a uniform instruction defining reasonable doubt). But the requirement of an instruction defining reasonable doubt was not effective until January 1, 1996. *Id.* Jackson was tried in 1993. Con-

sequently, *Portillo* does not apply. We find no error.

### 8. Failure to Give Interrogatory on First Degree Murder

 Jackson objected to the general verdict form sent to the jury, and asked that an interrogatory on the theories of first degree murder accompany the verdict form. He claims that the trial court committed reversible error by failing to give the requested interrogatory.

When a case is submitted on alternate theories of premeditated murder and felony murder, alternate verdict forms are helpful in eliminating issues on appeal. *See, e.g., State v. Krone*, 182 Ariz. 319, 321 n. 1, 897 P.2d 621, 623 n. 1 (1995). But this is a preferred practice for prudential purposes, not a requirement. *State v. Smith*, 160 Ariz. 507, 513, 774 P.2d 811, 817 (1989). We find no error.

### 9. Deadlocked Jury—Jury Coercion

Jackson argues that the trial court coerced the jury into reaching a verdict.

After the jury had deliberated 4 hours on a Friday afternoon and 1½ hours the following Monday morning, the foreperson sent a note that read: "Three jurors are voting not guilty due to lack of convincing evidence. None appear to be willing to change his mind. Suggestions as to how to proceed would be appreciated." Tr. Sept. 27, 1993 at 2. The court instructed the bailiff to tell the jury to deliberate another 20 minutes until noon, go to lunch, and come back at 1:00 p.m. to resume deliberations. When the bailiff returned, he said that the jury had asked him whether there would be an answer to its question. The court had the bailiff inform the jury that they would have an answer.

The court had intended to call the jury back at 1:30 p.m., if they had not reached a verdict by then, and inquire as to whether there was a reasonable probability that the jury could reach a verdict. However, other matters arose, and the trial court did not attend to the jury issue until 2:00 p.m. About that same time, the jury reached its verdict. Defense counsel moved for a mistrial, which was denied.

Jackson argues on appeal that the trial court committed reversible error by failing to inform the jury that it intended to provide them with additional instructions. According to Jackson, the court sent an implicit message to the jury that they were expected to reach a verdict.

 When and whether to discharge a jury is within the sound discretion of the trial judge. *State v. Villafuerte*, 142 Ariz. 323, 330, 690 P.2d 42, 49 (1984), *cert. denied*, 469 U.S. 1230, 105 S.Ct. 1234, 84 L.Ed.2d 371 (1985). The test for coerciveness is whether the trial court's actions or remarks, viewed in the totality of the circumstances, displaced the independent judgment of the jurors. *State v. McCutcheon*, 150 Ariz. 317, 320, 723 P.2d 666, 669 (1986).

 Looking to the totality of the circumstances, we find no coercion. First, the jury did not deliberate for an extraordinarily long time before reaching its verdict. The jury deliberated for 5½ hours before sending the note to the judge and 2½ more hours before reaching its verdict. The trial lasted 5 days, during which the state called 22 witnesses and introduced 52 exhibits. Second, Jackson's argument is one of omission. He argues that the court coerced the jury not by what he told them, but by a failure to act more quickly. Judgments about the reasonableness of the time allowed to reach a verdict and the timing of asking questions under Rule 22.5(b), Ariz.R.Crim.P., (the reasonable probability question) are largely within the discretion of the trial court. There was no abuse of discretion here.[2]

### 10. Trial Court's Failure to Disclose Juror's Letter

 A few days after the verdict, the foreperson sent the trial judge a "confidential" letter. The judge refused to disclose the contents of the letter to either party, because it contained information about the jury's mental processes and thus was inad-

---

2. Now see Rule 22.4, Ariz.R.Crim.P.

missible to impeach the verdict. Rule 24.1(d), Ariz.R.Crim.P.

The letter explained why the jury had appeared deadlocked for a short period of time. Some of the jurors had philosophical differences about the felony murder doctrine. The letter does not describe any juror misconduct, and Jackson concedes a new trial is not warranted on this basis. Instead, he argues that a new trial is required because, in sentencing him to death, the trial court considered information about which he had no opportunity to explain or deny.

The trial court should have disclosed the letter's contents. That it was not admissible does not mean the parties were not entitled to see it. *Cf. State v. Spears,* 184 Ariz. 277, 289, 908 P.2d 1062, 1074 (1996) (trial court disclosed jury foreperson's letter alleging juror misconduct); *State v. Rich,* 184 Ariz. 179, 181, 907 P.2d 1382, 1384 (1995) (trial court improperly failed to disclose jury's inconsistent verdicts). Nevertheless, the error was harmless.

Although it may be a denial of due process to sentence a person to death "on the basis of information which he had no opportunity to explain or deny," *Gardner v. Florida,* 430 U.S. 349, 361, 97 S.Ct. 1197, 1207, 51 L.Ed.2d 393 (1977); *State v. Nash,* 143 Ariz. 392, 402, 694 P.2d 222, 232 (1985), *cert. denied,* 471 U.S. 1143, 105 S.Ct. 2689, 86 L.Ed.2d 706 (1985), Jackson fails to point to anything in the record that indicates the trial judge based his sentencing decision on the juror's letter. We have reviewed the special verdict and nowhere does the court mention the letter or any information contained in it. We find no error.

### SENTENCING ISSUES

Under A.R.S. § 13–703(C), the state has the burden of proving beyond a reasonable doubt the existence of the aggravating circumstances contained in § 13–703(F). *State v. Spencer,* 176 Ariz. 36, 42, 859 P.2d 146, 152 (1993), *cert. denied,* 510 U.S. 1050, 114 S.Ct. 705, 126 L.Ed.2d 671 (1994). The defendant has the burden of proving by a preponderance of the evidence the existence of any mitigating circumstances. *Id.;* A.R.S. § 13–703(C). We independently review the record to determine the propriety of the death sentence. A.R.S. § 13–703.01(A); *Spencer,* 176 Ariz. at 42, 859 P.2d at 152.

### A. Aggravation

#### 1. Cruel, Heinous, or Depraved

The trial court found that the murder was committed in an especially cruel, heinous, or depraved manner under A.R.S. § 13–703(F)(6). Jackson argues that this finding is not supported by the evidence.

##### a. Cruelty

A crime is committed in an especially cruel manner when the perpetrator inflicts mental anguish or physical abuse before the victim's death. *State v. Walton,* 159 Ariz. 571, 586, 769 P.2d 1017, 1032 (1989), *aff'd,* 497 U.S. 639, 110 S.Ct. 3047, 111 L.Ed.2d 511 (1990). Mental anguish includes a victim's uncertainty as to her ultimate fate. *Id.*

The evidence shows beyond a reasonable doubt that the victim suffered mental anguish. Co-defendant Hernandez testified at the aggravation/mitigation hearing that Jackson drove the victim to a remote desert area in southeast Tucson. The drive lasted about 25–30 minutes, during which the victim repeatedly begged her captors not to hurt her. Hernandez described the victim as "scared." Tr. Jan. 19, 1994 at 49. At the scene of the murder, the victim got on her knees and continued to plead for her life. Jackson drew the gun down on her 3 times, walked back to the vehicle several feet away and then returned to the victim. Each time, within the hearing of the victim, Jackson spoke to Miles and Hernandez about her fate. On his third trip back to the victim, she stood and had her hands in the air in a defensive posture. The victim begged for her life. Jackson then shot her in the chest. The state proved cruelty beyond a reasonable doubt.

##### b. Heinous and Depraved

Heinousness and depravity focus on the defendant's state of mind. The trial court based its heinous or depraved finding

on three of the five *Gretzler* factors: (1) the senselessness of the murder, (2) the helplessness of the victim, and (3) relishing the murder.

▮▮▮ The state proved beyond a reasonable doubt that the victim's murder was senseless. The murder was not necessary to complete Jackson's criminal objective. Jackson could have easily obtained the victim's vehicle without killing her. She was driven to a remote desert area. He forced her to take off her shoes, jacket and, for a brief period, her pants. He could have left her in the desert and stolen her car without fear of immediate detection.

The state also proved the victim was helpless. She was unarmed. She had no shoes or jacket. She was outnumbered 3 to 1 and did not resist. The evidence showed that the bullet first passed through her forearm before it pierced her heart. This is consistent with the finding that she had her hands up in a defensive position before she was shot.

Finally, the state proved that Jackson relished the murder. Immediately after the murder, he began to sing a rap song. Later, Miles showed Jackson a picture he had found in her purse of the victim's children. Jackson again began to sing a rap song. On the drive back to Tucson, Jackson on two separate occasions expressed his desire to repeat the experience. They first came across a bicyclist and Jackson said, "Lets jack this guy right here." Tr. Jan. 19, 1994 at 62. Miles and Hernandez did not want to. Some time later, they passed a woman jogging. Jackson said, "Lets jack her, too." *Id.* at 78. Again, Miles and Hernandez chose not to.

The trial court also found that the murder was committed, at least in part, to eliminate the victim as a witness. We recently defined the circumstances under which witness elimination can be found. *State v. Ross*, 180 Ariz. 598, 606, 886 P.2d 1354, 1361 (1994), *cert. denied,* —— U.S. ——, 116 S.Ct. 210, 133 L.Ed.2d 142 (1995) (where defendant states witness elimination is motive for murder; where murder victim is witness to other crime and killed to prevent that person from testifying; where extraordinary circumstances exist). While the trial judge did not have *Ross* to consider, we find no evidence to

support a finding of witness elimination. Nevertheless, the court concluded, and we agree, that the murder was senseless, the victim was helpless, and Jackson relished it. Thus, the trial court properly found, and we agree, that the murder was committed in a heinous or depraved manner.

### 2. Pecuniary Gain

▮▮▮ The trial judge also found that the crime was committed for pecuniary gain. A.R.S. § 13–703(F)(5). Jackson does not challenge this finding and conceded at oral argument that his motivation was to steal the victim's car and valuables. We agree.

### B. Mitigation

The trial court found Jackson's age to be a statutory mitigating circumstance. The trial court also found Jackson's dysfunctional family background and lack of a prior felony conviction as relevant non-statutory mitigating circumstances. Jackson argues that his age coupled with his dysfunctional family background should have been substantial enough to outweigh the aggravating factors. We disagree.

### 1. 13–703(G)(5)—Age of Defendant

▮▮▮ It is well settled that the age of the defendant at the time of the commission of the murder can be a substantial and relevant mitigating circumstance. *State v. Valencia*, 132 Ariz. 248, 250, 645 P.2d 239, 241 (1982); *see Eddings v. Oklahoma*, 455 U.S. 104, 115, 102 S.Ct. 869, 877, 71 L.Ed.2d 1 (1982); A.R.S. § 13–703(G)(5). The younger the defendant, the greater the weight age has as mitigation. *See State v. Gerlaugh*, 144 Ariz. 449, 461, 698 P.2d 694, 705 (1985). However, chronological age is not the end point of the analysis, but the beginning. *See State v. Gillies (Gillies I)*, 135 Ariz. 500, 513, 662 P.2d 1007, 1020 (1983) (defendant's age alone will not always require leniency). In addition to youth, we consider defendant's level of intelligence, maturity, involvement in the crime, and past experience. *State v. Bolton*, 182 Ariz. 290, 314, 896 P.2d 830, 854 (1995) (citing cases). We turn then to the facts of this case.

We start with defendant's chronological age. Jackson was 16–years and 10–months old when he committed the murder. We agree with the trial court that defendant's age is a mitigating circumstance.

Next, we consider Jackson's intelligence. Psychological tests revealed Jackson is of average intellectual ability. He scored at or above his current grade level at the time of the murder in all academic areas, despite his erratic attendance and disruptive behavior at school.

We also consider Jackson's maturity in light of his family background, impulsivity, and judgment. A psychiatrist characterized Jackson's family history as seriously traumatic, disruptive, and marked by abandonment on multiple occasions by mother figures. According to the psychiatrist, Jackson's parents had not been present psychologically and even physically in their son's upbringing. In response, Jackson raised the ante through his criminal behavior to gain their attention and interaction. As a result, Jackson has a poorly developed conscience, marked impulsivity, and poor social judgment.

We are well aware that children who are emotionally and physically abused are adversely affected to some extent for the rest of their lives. Our criminal dockets are filled with such people. But we have never reduced a defendant's death sentence on such a basis. *See State v. Apelt (Rudi)*, 176 Ariz. 369, 377, 861 P.2d 654, 662 (1993), *cert. denied*, —— U.S. ——, 115 S.Ct. 110, 130 L.Ed.2d 57 (1994) (a character or personality disorder is generally not sufficient for mitigation); *State v. Schurz*, 176 Ariz. 46, 57, 859 P.2d 156, 167 (1993), *cert. denied*, 510 U.S. 1026, 114 S.Ct. 640, 126 L.Ed.2d 598 (1993) (less than ideal family life which resulted in a violent personality extremely maladapted to living in society weighs as much in favor of the death penalty as against it). Moreover, Jackson's level of participation in the murder and past experience belie the claim that he killed impulsively.

Jackson was a major participant throughout the entire course of the kidnapping, robbery, and murder. On the morning of the murder, he met with Hernandez and asked him where he could obtain a gun to commit a robbery. Jackson and Miles then accompanied Hernandez to a home where Jackson broke in and stole a gun. On their way back from the home, Hernandez suggested that they rob a nearby Dairy Queen. Jackson declined. Instead, as a car approached, Jackson said, "watch me jack this bitch," and attempted to "car jack" the driver. Tr. Jan. 19, 1994 at 37. The driver, however, quickly sped-off before Jackson could reach her.

Thwarted in his first "car jacking" attempt, Jackson thought up a ruse. As the victim's car approached, he asked her for a "light." *Id.* at 44. He then pointed the gun at her and took over. He drove the car approximately 30 minutes to a remote desert area, unaffected by his victim's pleas for mercy. He did not kill her immediately. Instead, he pondered his victim's fate while she begged for her life.

Jackson's crime does not show juvenile impulsivity. He planned it, made all the necessary preparatory steps, and carried it out. Instead of robbing the victim at the point of abduction, which might reflect the impulsive act of a young, inexperienced and immature person, Jackson drove her to a remote desert area to accomplish his crimes. He displayed deliberateness and an ability to delay gratification. *See State v. Walton*, 159 Ariz. 571, 589, 769 P.2d 1017, 1035 (1989) (carrying out plan over significant period of time reflects delay of gratification and maturity).

To explain away the obvious deliberateness of his crimes, Jackson claims that Miles goaded him into killing the victim. While Jackson contemplated the victim's fate in the desert, Miles told him that he "didn't have the heart" to kill the victim. Tr. Jan. 19, 1994 at 54. But Hernandez told Miles in front of Jackson that Jackson was "not stupid." *Id.* Moreover, both Miles and Hernandez later urged Jackson to "strip the victim" and leave her naked in the desert so that "she would be embarrassed to walk around or call the cops." *Id.* at 55. Just before Jackson shot her, Hernandez pleaded with him to "just leave" and "leave her alone." *Id.* at 57.

Finally, we consider Jackson's past experience. He had 11 juvenile referrals from the age of 12, ranging from shoplifting and weapons offenses to assault. Jackson has a history of assaultive and delinquent behavior that escalated in severity despite some efforts at treatment.

We have independently reviewed the record and agree with the trial judge that neither Jackson's age nor other mitigating factors are sufficiently substantial to call for leniency.

## C. Disparate Sentences

 Jackson argues that his death sentence is so disparate to Hernandez's sentence that it violates the Eighth Amendment. We disagree.

Hernandez entered into a plea agreement which subjected him to 10–20 years in prison. We have given little, if any, significance to a disparity in sentencing that is justified by the relative culpability of the parties. *State v. Schurz,* 176 Ariz. 46, 57, 859 P.2d 156, 167 (1993) (disparity justified by fact that defendant did the killing); *State v. Clabourne,* 142 Ariz. 335, 349, 690 P.2d 54, 68 (1984) (same).

Jackson is more culpable than Hernandez. Jackson approached the victim. He drove the vehicle. He ordered the victim out of the car. He held the gun on her. He shot and killed her.

## D. Constitutionality of Arizona's Death Penalty Statute

 Jackson argues that Arizona's death penalty statute is unconstitutional because no objective standards exist to assist the sentencing court in weighing aggravating circumstances against mitigating circumstances. We rejected this argument in *State v. Correll,* 148 Ariz. 468, 484, 715 P.2d 721, 737 (1986).

### DISPOSITION

We reviewed the record for fundamental error and found none before we decided *State v. Smith,* 184 Ariz. 456, 460, 910 P.2d 1, 5 (1996) (holding that the repeal of A.R.S. § 13–4035 is procedural and not substantive and therefore fully retroactive); *see also*

*State v. Kemp,* 185 Ariz. 52, 67, 912 P.2d 1281, 1296 (1996). For the foregoing reasons, we affirm Jackson's convictions and sentences.

ZLAKET, V.C.J., MOELLER, J. and ROBERT J. CORCORAN, Justice, Retired, concur.

FELDMAN, Chief Justice, specially concurring.

I concur in the court's opinion and join in affirming the conviction.

Reluctantly, I also join in affirming the death penalty. As the court notes, neither the United States nor Arizona Constitution forbids the execution of a sixteen-year-old boy. What is not forbidden, however, is also not commanded by the constitution. We have the discretion to impose either the death penalty or life imprisonment on Defendant. We exercise this discretion in light of the principle that youth is one of the most important mitigating factors to be considered when deciding whether death is the appropriate penalty. *State v. Valencia,* 132 Ariz. 248, 250–51, 645 P.2d 239, 241–42 (1982); *see also Eddings v. Oklahoma,* 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982).

Even with this principle in mind, I find it necessary to join in affirming the death penalty in this case. The facts are so egregious and the crime so shockingly evil that to hold that Defendant's age alone outweighs the aggravating circumstances is to say that we will never impose the death penalty on a sixteen-year-old defendant. In itself, that might not be an inappropriate statement. But having said that, at what age do we draw the line? Arizona has enacted a constitutional capital sentencing law that draws no bright line at age. Consequently, our law allows imposition of the death penalty on any defendant at least sixteen years of age. *Stanford v. Kentucky,* 492 U.S. 361, 109 S.Ct. 2969, 106 L.Ed.2d 306 (1989) (Eighth Amendment forbids execution of children below the age of sixteen).

Thus, in view of the deplorable facts in this case and the absence of other significant mitigation, I am forced to approve the death penalty, even though it is quite evident that

by imposing such penalty on Levi Jaimes Jackson, we say almost as much about our society and ourselves as we do about Jackson and his crime.