11 P.3d 1209 (2000)
The STATE of Nevada, Petitioner,
v.
The SECOND JUDICIAL DISTRICT COURT of the State of Nevada, In and For the COUNTY OF WASHOE, and the Honorable Jerome M. Polaha, District Judge, Respondents,
Calvin Miles Marshall and Raymond Edward Currington, Real Parties in Interest.
No. 36090.
Supreme Court of Nevada.
November 2, 2000.
*1210 Frankie Sue Del Papa, Attorney General, Carson City, Richard A. Gammick, District Attorney, Gary H. Hatlestad, Deputy District Attorney, Washoe County, for petitioner.
Michael R. Specchio, Public Defender, John Reese Petty, Chief Deputy Public Defender, Washoe County, for real party in interest Marshall.
Richard F. Cornell, M. Jerome Wright, Reno, for real party in interest Currington.
BEFORE THE COURT EN BANC.

OPINION
PER CURIAM.
This is an original petition by the State for a writ of mandamus or prohibition. The petition challenges district court orders denying motions to file late notices of intent to seek the death penalty. The State contends that it should be allowed to file the late notices for two reasons. First, it claims that the district court erred in following SCR 250(4)(c), which requires a notice of intent to seek death to be filed within thirty days after the filing of the information. The State argues that the rule is invalid because it conflicts with a statute and this court lacks authority to promulgate rules of criminal procedure. Second, assuming SCR 250 is valid, the State claims that the district court abused its discretion in failing to find good cause for late filing of the notices. We conclude that extraordinary relief is not warranted.

FACTS
Early in the morning on June 26, 1999, David Kloehn was stabbed to death while working as a bartender at Mr. O's Corner Bar in Reno. He received numerous wounds, including to both eyes. Raymond Edward Currington and Calvin Miles Marshall, the real parties in interest here and the defendants below, were the last patrons seen in the bar, at around 3:15 a.m., before Kloehn's body was discovered a little after 4:00 a.m. Later that day police searched Currington's pickup truck and a motel room occupied by him and Marshall. The police found incriminating evidence, including blood stains in the truck which matched the victim's blood and racks of tokens in the motel room taken from Mr. O's Corner Bar.
Two days later, the State filed an amended criminal complaint charging Currington and Marshall with first-degree murder with use of a deadly weapon, robbery with use of a deadly weapon, and conspiracy to commit *1211 robbery with use of a deadly weapon. Pursuant to former SCR 250(4)(a),[1] the State also filed a notice reserving the right to seek the death penalty.
The Washoe County Public Defender was appointed to represent Marshall, and two Deputy Public Defenders were assigned to the case. Two other lawyers were later appointed for Currington. The defendants' cases were severed. Marshall's preliminary hearing occurred in July 1999, and Currington's in August 1999. Both were bound over for trial on all counts.
Informations charging the same counts as in the amended complaint were filed, one against Marshall on July 22, 1999 (District Court Case No. CR99-1319), and another against Currington on September 1, 1999 (CR99-1575). Notices of intent to seek the death penalty against the two men were not submitted to the district court until November 3, 1999: 104 days after the information was filed against Marshall and 63 days after the information was filed against Currington. Absent good cause, SCR 250(4) requires such notice no later than thirty days after the filing of an information. The State moved in each case for leave to file the notices, alleging good cause for their lateness. Marshall and Currington opposed the motions.
On January 4, 2000, the district court heard arguments on the filing of the untimely notice of intent to seek the death penalty in Currington's case and ruled to allow it. About five weeks later, however, the court changed its position in Marshall's case and denied the State's motion for leave to file the late notice. The court then reconsidered its previous ruling in Currington's case and denied the State's motion there as well. (The facts relevant to these rulings are set forth below in discussing the district court's exercise of its discretion.) Pursuant to the State's request, the district court stayed its proceedings until this court rules on the present petition.

DISCUSSION
Petitions for extraordinary writs are addressed to the sound discretion of the court and may issue only when there is no plain, speedy, and adequate remedy at law. Parsons v. District Court, 110 Nev. 1239, 1242, 885 P.2d 1316, 1318 (1994); NRS 34.170; NRS 34.330. A writ of mandamus may issue to compel the performance of an act which the law requires as a duty resulting from an office, trust, or station. See NRS 34.160. A writ of prohibition may issue to arrest the proceedings of a district court exercising its judicial functions when such proceedings are in excess of the court's jurisdiction. NRS 34.320.
Here, the State has no adequate remedy at law if the trials proceed without the death penalty as a sentencing option. Because the State seeks to compel the district court to allow the filing of the notices of intent to seek the death penalty, we treat the State's petition as one for mandamus relief.
"Mandamus will not lie to control discretionary action, unless discretion is manifestly abused or is exercised arbitrarily or capriciously." Round Hill Gen. Imp. Dist. v. Newman, 97 Nev. 601, 603-04, 637 P.2d 534, 536 (1981) (citation omitted) "Even when mandamus is available as a remedy, we are not compelled to issue the writ because it is purely discretionary." State ex. rel. Dep't Transp. v. Thompson, 99 Nev. 358, 361, 662 P.2d 1338, 1340 (1983).

The validity of SCR 250
The State contends that SCR 250(4) is invalid and so the district court acted without authority in denying the State's motions to file the late notices of intent to seek death. The State claims that SCR 250(4) conflicts with NRS 175.552(3). It also claims that only the Legislature can enact rules of criminal procedure and that this court's issuance of SCR 250 violates the separation of powers set forth in the Nevada Constitution. We conclude that both claims lack merit.
*1212 NRS 175.552(3) provides in relevant part: "The state may introduce evidence of additional aggravating circumstances as set forth in NRS 200.033, other than the aggravated nature of the offense itself, only if it has been disclosed to the defendant before the commencement of the penalty hearing."
SCR 250(4)(c) provides:
No later than 30 days after the filing of an information or indictment, the state must file in the district court a notice of intent to seek the death penalty. The notice must allege all aggravating circumstances which the state intends to prove and allege with specificity the facts on which the state will rely to prove each aggravating circumstance.
SCR 250(4)(d) provides in part:
Upon a showing of good cause, the district court may grant a motion to file a late notice of intent to seek the death penalty or of an amended notice alleging additional aggravating circumstances. The state must file the motion within 15 days after learning of the grounds for the notice or amended notice.

The alleged conflict between rule and statute
Referring to NRS 175.552(3), the State argues that other than providing a time limit within which to allege aggravating factors, "our legislature set forth no time limits for filing of a notice of intent to seek the death penalty. Indeed, the procedure set forth by our legislature does not require such a pleading." The State concludes, therefore, that an "irreconcilable conflict" exists between the statute and SCR 250(4). This conclusion is unwarranted.[2]
There is no conflict between the rule and the statute. NRS 175.552 is silent in regard to giving any notice of intent to seek death other than requiring disclosure of evidence of aggravating circumstances before the penalty hearing begins. The State construes this silence as precluding requirement of any earlier notice, as if the statute provided that `no notice of intent to seek death is required earlier than immediately before the penalty hearing.' The State offers no basis for reading the statute this way, and such a reading is untenable.
If NRS 175.552(3) precluded requiring any notice of intent to seek death earlier than "before the commencement of the penalty hearing," then the prosecution could conduct an entire murder trial and obtain a guilty verdict, or obtain a guilty plea, before informing a defendant that he faced a possible death sentence. We doubt that the State could seriously maintain that such a procedure would satisfy constitutional due process. In fact, this court has already held that technical compliance with NRS 175.552 failed to satisfy due process in one case. See Emmons v. State, 107 Nev. 53, 807 P.2d 718 (1991). In Emmons, the court held that the purpose of NRS 175.552 is to ensure due process and that notice of aggravating evidence provided one day before the commencement of a penalty hearing was inadequate to meet the requirements of due process. Id. at 62, 807 P.2d at 724. In another case, in concluding that formal notice of an aggravating circumstance given one week before a penalty hearing did not violate due process, this court relied in part on the fact that notice to seek the death penalty had been filed over three months before the hearing. See Rogers v. State, 101 Nev. 457, 466-67, 705 P.2d 664, 670-71 (1985).
We conclude that SCR 250(4) and NRS 175.552(3) do not conflict and that both are intended to ensure that defendants in capital cases receive notice sufficient to meet due process requirements.

This court's authority to promulgate rules
Even if the rule and statute do not conflict, the State's position is that SCR 250 has no force because this court had no authority to issue it. Extensive case law contradicts the State's position.
This court has repeatedly and consistently held that the courts of this state have the power to make their own procedural rules. "The judiciary, of course, has the inherent power to govern its own procedures; and that power includes the right to adopt and *1213 promulgate rules of procedure." Whitlock v. Salmon, 104 Nev. 24, 26, 752 P.2d 210, 211 (1988). "[T]here are regulating ... powers of the Judicial Department that are within the province of the judicial function, i.e., promulgating and prescribing any and all rules necessary or desirable to handle the business of the courts or their judicial functions." Galloway v. Truesdell, 83 Nev. 13, 23, 422 P.2d 237, 244 (1967). See also Goldberg v. District Court, 93 Nev. 614, 617, 572 P.2d 521, 523 (1977).
Further, this court's procedural rules supersede any conflicting statutes.
We have held that the legislature may not enact a procedural statute that conflicts with a pre-existing procedural rule, without violating the doctrine of separation of powers, and that such a statute is of no effect. Furthermore, where ... a rule of procedure is promulgated in conflict with a preexisting procedural statute, the rule supersedes the statute and controls.
State v. Connery, 99 Nev. 342, 345, 661 P.2d 1298, 1300 (1983) (citation omitted); see also SCR 249(2).
Nevertheless, the State maintains, as follows, that this court had no power to promulgate SCR 250.
The Nevada Constitution provides that the Legislature may enact general laws "[r]egulating the practice of courts of justice." See Nev. Const. art. 4, §§ 20 and 21.[3] This court has held that the Legislature has the power to regulate procedure in criminal cases. See, e.g., Colwell v. State, 112 Nev. 807, 813, 919 P.2d 403, 407 (1996). Article 3, Section 1 of the Nevada Constitution provides:
1. The powers of the Government of the State of Nevada shall be divided into three separate departments,the Legislative,the Executive and the Judicial; and no persons charged with the exercise of powers properly belonging to one of these departments shall exercise any functions, appertaining to either of the others, except in the cases expressly directed or permitted in this constitution.
Based on this authority, the State reasons: one department of government can never exercise a power belonging to another; the Legislature has the power to regulate criminal procedure; therefore, that power belongs exclusively to the Legislature, and this court cannot have such power. We disagree.
Under the Nevada Constitution two departments can in some cases exercise the same power. Article 3, Section 1, provides that persons in one department can exercise functions "appertaining" to another "in the cases expressly directed or permitted in this constitution." As cases such as Whitlock, Galloway, and Goldberg make clear, the regulation of criminal procedure is a power inherently appertaining to the judicial department. We conclude that the Legislature may exercise this function too only because Sections 20 and 21 of Article 4 permit it to do so. And, to reiterate, to the extent that any legislative regulation in this area contradicts the judiciary's exercise of its inherent power, the latter prevails. See Connery, 99 Nev. at 345, 661 P.2d at 1300.
The State also cites NRS 2.120, which provides:
1. The supreme court may make rules not inconsistent with the constitution and laws of the state for its own government, the government of the district courts, and the government of the State Bar of Nevada....
2. The supreme court, by rules adopted and published from time to time, shall regulate original and appellate civil practice and procedure....
The State stresses that NRS 2.120(2) only addresses rules regulating "civil practice and procedure," not criminal proceedings. Further, it asserts that the rule-making allowed by NRS 2.120(1), for the "government" of the courts, does not entail "procedure or practice." *1214 It concludes therefore that this statute precludes this court from promulgating criminal procedural rules.
This argument is of no avail. NRS 2.120 cannot limit this court's inherent authority to regulate criminal procedures. Pursuant to the doctrine of separation of powers,
it is clear that the judiciary, as a coequal branch of government, has inherent powers to administer its affairs, which include rule-making and other incidental powers reasonable and necessary to carry out the duties required for the administration of justice. Any infringement by the legislature upon such power is in degradation of our tripartite system of government and strictly prohibited.
Although these inherent powers exist independent of constitutional or statutory grant, we have recognized that "[t]he legislature may, by statute, sanction the exercise of inherent powers by the courts, and the courts may acquiesce in such pronouncements by the legislature, ..." Lindauer v. Allen, 85 Nev. 430, 434, 456 P.2d 851, 854 (1969). Even so, we remain ever mindful that such statutes are merely legislative sanctions of independent rights already belonging to the courts, and where, as here, those statutes attempt "to limit or destroy an inherent power of the courts, [such statutes] must fail." Lindauer v. Allen, 85 Nev. at 434, 456 P.2d at 854.
Goldberg, 93 Nev. at 615-17, 572 P.2d at 522 (citations and footnotes omitted) (alterations in original).
Thus, to the extent that NRS 2.120 countenances and codifies this court's independent power to regulate judicial procedures, it is valid. To the extent that it seeks to curtail that power, it fails.
Finally, the State concedes that this court has certain inherent powers but claims that these "do not extend to creating rules of criminal procedure." The State professes to be unable to discern the "starting point" for such an inherent power. It offers, however, no apposite authority or cogent argument for the proposition that the judiciary lacks such power.
The origin and nature of the inherent powers of the judiciary are definitively explained in Galloway, 83 Nev. 13, 422 P.2d 237.
"Judicial Power" is the capability or potential capacity to exercise a judicial function. That is, "Judicial Power" is the authority to hear and determine justiciable controversies. Judicial power includes the authority to enforce any valid judgment, decree or order. A mere naked power is useless and meaningless. The power must be exercised and it must function to be meaningful.... Judicial function includes the right to exercise any lesser power that can be subsumed under, or is included as an integral part of, the broader heading of "Judicial Power"; that is, any power or authority that is inherent or incidental to a judicial function is properly within the realm of judicial power, as described above.
Id. at 20, 422 P.2d at 242.
In addition to the constitutionally expressed powers and functions of each Department, (the Legislative, the Executive, and the Judicial) each possesses inherent and incidental powers that are properly termed ministerial. Ministerial functions are methods of implementation to accomplish or put into effect the basic function of each Department. No Department could properly function without the inherent ministerial functions. Without the inherent powers of ministerial functions each Department would exist in a vacuum. It would be literally helpless.
Id. at 21, 422 P.2d at 243.
While the licensing and regulating of subjects such as marriage, businesses, concealed weapons, and public utilities are properly within the legislative sphere,
there are regulating and licensing powers of the Judicial Department that are within the province of the judicial function, i.e., licensing attorneys to practice law; prescribing rules of professional conduct for attorneys and judges; disbarring attorneys; promulgating and prescribing any and all rules necessary or desirable to handle the business of the courts or their judicial functions. In short, everything is a proper subject of licensing, controlling *1215 and regulating when the authority asserted by the judiciary can logically and legitimately be traced back to, and is derived from, the Judicial Power, as described above.
Id. at 23, 422 P.2d at 244 (emphasis added).
Therefore, this court indisputably possesses inherent power to prescribe rules necessary or desirable to handle the judicial functioning of the courts, and properly falling within that power are the provisions in SCR 250(4) requiring the State to give a defendant notice of intent to seek the death penalty.

The district court's exercise of its discretion
Even if SCR 250 is valid, the State contends that extraordinary relief is in order because the district court abused its discretion in denying the motions for leave to file the untimely notices of intent to seek the death penalty. We conclude that the court acted within its discretion under SCR 250(4).

Facts
As good cause for the late filings, the State's motions informed the district court that the State had been gathering information on each defendant's prior convictions to determine if certain aggravating circumstances were present. The motions also explained that the District Attorney's office "staffs" murder cases, i.e., evaluates the aggravating circumstances to determine if death is an appropriate sentence to seek. The motions further stated that the prosecutor had been involved in the prosecution of a murder trial of two defendants which began on May 24, 1999,[4] and another murder trial of two defendants which began on September 13, 1999. Preparation for the latter, a retrial, required review of more than two thousand pages of trial transcripts. At the evidentiary hearing on the State's motion in Currington's case, the prosecutor told the court: "So during the course of the pendency of this case, I was wrapped up in other matters. And ... the notice didn't get filed on time. When I discovered that I had failed to file the notice, I filed it that day, took it over to the defense." The State also argued that the defendants were not prejudiced because they had been put on notice that the State might seek the death penalty when they were arraigned in June 1999.
Attached to the State's motions were notices of intent to seek the death penalty. In regard to Currington, the notice alleged two aggravating circumstances: the murder was committed while he was engaged in the commission of or an attempt to commit or flight after committing or attempting to commit a robbery (NRS 200.033(4)), and the murder involved torture or mutilation of the victim (NRS 200.033(8)). The notice referenced the evidence adduced at the preliminary hearing to support the first aggravator and the autopsy report to support the second. In regard to Marshall, the notice alleged the same two aggravating circumstances plus two others: when Marshall committed the murder, he was under sentence of imprisonment (NRS 200.033(1)) and had been convicted of a felony involving the use or threat of violence (NRS 200.033(2)). To support the two additional aggravators, the State would present evidence from the Colorado Department of Corrections that Marshall had been on parole at the time of the murder and evidence from Adams County, Colorado, that he had committed two robberies in 1992.
In denying the State's motion in Marshall's case, the district court concluded the following. The language of SCR 250(4)(c) and (d) was plain and unambiguous. The time limit for filing a notice of intent was mandatory, and late filing was permissible only for good cause. The State alleged good cause "based on the work load of the office and the complexity of death penalty cases," but this does not rise to the level of good cause under SCR 250(4)(d). "Everything that the State considered in this case before deciding to seek the death penalty was known to it prior to the arraignment in the district court. There was no good cause shown for the delay." The court noted its earlier contrary ruling in regard to Currington, where it had decided *1216 that the purpose of the Rule was to put the defendants on notice that the ultimate penalty was being sought ... and that the State satisfied that requirement by its filing the reservation to seek the death penalty in the Justice Court.... However, the Rules contemplate such a filing and still require the formal notice to be filed 30 days after the filing of the Information in the district court.
The court concluded:
If a busy workload passes muster in this case then the doors will be thrown open to the next inquiry of what constitutes busy how busy must a prosecutor be before a court says not enough. This could not be what the Supreme Court had in mind when it wrote the Rules. Such an interpretation would render both 4(c) and 4(d) nugatory with regard to the early time limits and attribute to the Supreme Court the performance of idle ceremony in enacting such requirements.
In denying the State's motion in Currington's case, the district court explained: "[T]he only discretion for the Court to exercise is whether to allow a late filing when information concerning aggravators was not in the possession of the state prior to the 30 day filing deadline."
The State filed supplemental points and authorities and moved for reconsideration of the district court's orders. The district court denied that motion as well.

Discussion
SCR 250(4)(c) requires the State to file a notice of intent to seek the death penalty "[n]o later than 30 days after the filing of an information." SCR 250(4)(d) provides:
Upon a showing of good cause, the district court may grant a motion to file a late notice of intent to seek the death penalty or of an amended notice alleging additional aggravating circumstances. The state must file the motion within 15 days after learning of the grounds for the notice or amended notice. If the court grants the motion, it shall also permit the defense to have a reasonable continuance to prepare to meet the allegations of the notice or amended notice. The court shall not permit the filing of an initial notice of intent to seek the death penalty later than 30 days before trial is set to commence.
There is no dispute that the State failed to meet the (4)(c) filing deadline by a month in Currington's case and more than two months in Marshall's case. The only question is whether the district court manifestly abused its discretion or exercised it arbitrarily or capriciously in finding no good cause under (4)(d) for the late filings. See Round Hill, 97 Nev. at 603-04, 637 P.2d at 536.
In contending that the district court abused its discretion, the State relies primarily on SCR 249(1): "The rules set forth in this part shall be liberally construed to secure the proper and efficient administration of the business and affairs of the court in the cases to which these rules apply and to promote and facilitate the administration of justice by the court." (Emphasis added.) The State stresses that the defendants would not be prejudiced by a late filing since they learned at their arraignment that the State might seek a death sentence and qualified counsel were appointed for them. Therefore, the State argues, the district court clearly abused its discretion by not liberally construing SCR 250(4)(d) and finding that the prosecutor's busy schedule and the complexity of a capital prosecution constitute good cause for a late filing.
The State offers, at first glance, a colorable argument for the proposition that the district court might have been within its discretion if it had allowed the late filings in this case.[5] *1217 However, the argument does not even begin to establish that the district court manifestly abused its discretion or acted arbitrarily or capriciously in not allowing the late filings, as is required for this court to grant extraordinary relief. On the contrary, the record shows that the district court carefully considered SCR 250(4) and the facts and then acted reasonably and within its discretion in concluding that no good cause existed.
We decline, however, to adopt in whole the district court's reading of SCR 250(4)(d). The first sentence of (4)(d) provides that the district court "may" grant a motion to file a late notice of intent to seek death "[u]pon a showing of good cause." The second sentence requires the State to file the motion within fifteen days of "learning of the grounds for the notice." The district court concluded that this phrase refers to the prosecution's discovery of formerly unknown evidence of a statutory aggravator and that only this circumstance can constitute good cause. The State asserts: "Absent an explicit enumeration of what good cause is and [is not], that question must be decided on a case-by-case ad hoc basis."
The district court was correct to conclude that SCR 250(4)(d) contemplates discovery of formerly unknown evidence of aggravating circumstances as "grounds" for good cause. However, we do not conclude that this is the only conceivable instance which could constitute good cause or that the language of the rule requires such a narrow interpretation. Nor is such a narrow reading necessary to support the district court's ruling. Here, the court reasonably determined that the workload of the prosecutor and the complexity of the case did not constitute good cause.
The district court also correctly concluded that mere oversight on the part of a prosecutor does not constitute good cause. The reason for the late filings in this case was simply that the prosecutor overlooked the deadline: "When I discovered that I had failed to file the notice, I filed it that day." Nothing prevented the prosecutor from immediately submitting the notices once he noticed the deadline had passed. The State has not disputed the district court's finding that "[e]verything that the State considered in this case before deciding to seek the death penalty was known to it prior to the arraignment." "An attorney's inadvertence alone is not good cause." State v. Dearbone, 125 Wash.2d 173, 883 P.2d 303, 306 (1994).
We conclude that the district court acted within its sound discretion in finding that no good cause existed in this case.
The State relies on the lack of prejudice to the defendants as a basis for allowing the late filings. SCR 250(4)(d) does not expressly mention prejudice, but its third sentence implicitly deals with prejudice by requiring a reasonable continuance for the defense when a late filing is allowed. Thus, if prejudice to the defendant results from the filing of a late notice of intent to seek the death penalty, it can be cured by a reasonable continuance. And as a bright-line rule to prevent prejudice, the fourth sentence of (4)(d) provides that in no event can an initial notice of intent (as opposed to an amended notice) be filed later than thirty days before trial. However, nothing in the rule suggests that lack of prejudice to the defendant can supplant the express requirement of a showing of good cause before the district court may grant a motion to file a late notice of intent to seek death.
The State cites decisions by the Arizona Supreme Court upholding trial court rulings allowing late filing of a notice of intent to seek the death penalty absent prejudice to the defendant. See State v. Jackson, 186 Ariz. 20, 918 P.2d 1038, 1042 (1996); State v. Lee, 185 Ariz. 549, 917 P.2d 692, 698-99 (1996). However, unlike SCR 250, the relevant Arizona rules do not require good cause for a late filing, but instead charge the trial court with broad discretion to impose an appropriate sanction should the prosecution fail to comply with the filing deadline. See Jackson, 918 P.2d at 1042 (citing Arizona Rules of Criminal Procedure 15.1(g)(1), 15.1(g)(4), and 15.7). Also, these Arizona decisions affirm on direct appeal rulings to allow a late filing; they do not grant extraordinary *1218 relief and overturn a trial court's ruling to deny a late filing.
Currington cites Washington case law, which supports the district court's ruling here. A Washington statute requires the prosecution to file notice of its intent to seek the death penalty within thirty days of arraignment unless good cause is shown for an extension. State v. Luvene, 127 Wash.2d 690, 903 P.2d 960, 976 (1995); Dearbone, 883 P.2d at 304-05. The Washington Supreme Court held: "[G]ood cause requires a reason external to the prosecutor for his failure to serve notice. Without this external reason, defendant's actual notice of the State's intent and the corresponding lack of prejudice to defendant's case is irrelevant." Dearbone, 883 P.2d at 305.
Thus, despite the lack of prejudice to the defendants, the district court acted within its sound discretion in not permitting the late notices to be filed.

CONCLUSION
SCR 250 is a valid product of this court's inherent authority to regulate procedure in criminal cases. The district court acted within its discretion in applying the rule and denying the State's motions to file late notices of intent to seek the death penalty. We therefore deny the State's petition for an extraordinary writ.
NOTES
[1] Before its amendment effective January 20, 2000, SCR 250(4)(a) required the State to declare at the defendant's first appearance before a magistrate whether it reserved the right to seek the death penalty.
[2] Even if the two conflicted, the rule would prevail, as we discuss below.
[3] Article 4, Section 20, provides in part:

The legislature shall not pass local or special laws in any of the following enumerated casesthat is to say:
...
Regulating the practice of courts of justice[.]
Article 4, Section 21, provides:
In all cases enumerated in the preceding section, and in all other cases where a general law can be made applicable, all laws shall be general and of uniform operation throughout the State.
[4] Currington and Marshall were not even arrested until more than a month later. Unless the trial starting in May was unusually long, it has no relevance to the deadlines involved here, late August and early October 1999.
[5] We address the essential weaknesses in the State's argument in the body of the opinion. However, it is also questionable whether the "liberally construe" provision of SCR 249(1) is as broad as the State supposes. The United States Supreme Court considered the effect of Federal Rule of Criminal Procedure 2, which states that the rules "`shall be construed to secure simplicity in procedure, fairness in administration and the elimination of unjustifiable expense and delay.'" See Carlisle v. United States, 517 U.S. 416, 424, 116 S.Ct. 1460, 134 L.Ed.2d 613 (1996) (quoting Rule 2). The Court concluded that Rule 2 "sets forth a principle of interpretation to be used in construing ambiguous rules, not a principle of law superseding clear rules that do not achieve the stated objectives." Id.