SUPREME COURT OF ARIZONA
En Banc

| | |
|---|---|
| STATE OF ARIZONA, | ) Arizona Supreme Court |
| | ) No. CR-04-0343-AP |
| Appellee, | ) |
| | ) Maricopa County |
| v. | ) Superior Court |
| | ) No. CR1999-017624 |
| RUBEN GARZA, | ) |
| | ) |
| Appellant. | ) |
| | ) **O P I N I O N** |
| _____ | ) |

Appeal from the Superior Court in Maricopa County
The Honorable Gregory H. Martin, Judge

**AFFIRMED**
_____

TERRY GODDARD, ARIZONA ATTORNEY GENERAL                Phoenix
     By   Kent E. Cattani, Chief Counsel,
          Capital Litigation Section
          Patricia A. Nigro, Assistant Attorney General
Attorneys for the State of Arizona

RICHARD D. GIERLOFF                                     Phoenix
Attorney for Ruben Garza
_____

**H U R W I T Z**, Justice

¶1      A jury convicted Ruben Garza of two counts of first degree murder.  The jury then determined that Garza should be sentenced to life imprisonment for one murder and death for the other.

¶2      An automatic notice of appeal was filed pursuant to Arizona Rule of Criminal Procedure 31.2(b).  This Court has

jurisdiction under Article 6, Section 5(3) of the Arizona Constitution and A.R.S. § 13-4031 (2001).

## I. FACTS AND PROCEDURAL BACKGROUND[1]

### A.

¶3        In September 1999, Ellen Franco moved into a two-bedroom house in Waddell occupied by Jennifer Farley and Farley's boyfriend, Lance Rush.  Ellen had recently separated from her husband, Larry Franco.

¶4        At approximately 10:30 p.m. on December 1, 1999, Farley heard a knock at the door.  Upon opening the door she saw a Hispanic male who was five feet nine or ten inches tall, about 180 to 200 pounds, and had bad acne.  He had a large tattoo on his left arm.  The visitor pointed at Ellen, who was by then standing behind Farley, and said, "I am here to see her."  Ellen identified the visitor as "Ben," whom Farley understood to be Ellen's relative.[2]

¶5        Ellen went outside; Farley went to her bedroom and told Rush about the visitor.  Farley then heard two gunshots.

---

[1]     Except for facts relating to our independent review of the death sentence, *see* A.R.S. § 13-703.04(A) (Supp. 2006), the facts are presented in the light most favorable to sustaining the jury's verdict, *State v. Tucker*, 205 Ariz. 157, 160 n.1, 68 P.3d 110, 113 (2003).

[2]     Garza had severe acne in late 1999, has a large tattoo on his left arm, and otherwise fits Farley's description of the visitor.  Larry Franco is Garza's uncle.

2

Rush and Farley scrambled to grab one of the guns they kept in their bedroom, and Farley took a pistol from her nightstand. By the time she removed the gun from its holster, the locked door to the bedroom had somehow been opened.

¶6 Rush, who had not been able to get one of the other firearms, motioned for Farley to stay in the room and went into the hallway. Farley heard a gunshot almost immediately thereafter and quickly hid in the bedroom closet. After entering the closet, she heard several more shots.

¶7 After waiting briefly, Farley came out of the bedroom closet. She saw Ellen lying face down in the living room in a pool of blood. After determining that Ellen was alive, Farley looked for Rush. She found him in the guest bedroom opposite their bedroom. He was conscious but bleeding. Farley dialed 911, and police and paramedics arrived within minutes. Rush was lucid and said, "Someone kicked the door and started shooting."

¶8 Ellen never regained consciousness and died at St. Joseph's Hospital shortly after the shooting. Rush died at John C. Lincoln Hospital approximately an hour after the shooting.

**B.**

¶9 Around 12:45 a.m. on December 2, Garza bought bandages, gauze, and hydrogen peroxide from a drugstore in west Phoenix. Later that morning, he was treated at Phoenix Baptist Hospital for a gunshot wound to his left arm. The hospital

contacted Phoenix police. Garza told the responding officer that he was walking down the street when an unknown assailant drove by and shot him.

¶10 Maricopa County Sheriff's Office ("MCSO") detectives questioned Garza the next morning. Garza first claimed that he had been shot in a drive-by, but changed his story when told that he had been identified by Farley as the visitor to the Waddell house. He then stated that he had gone there to persuade Ellen to reconcile with Larry. Ellen came out and talked to him. When their conversation turned into an argument, Garza pulled out his gun and shot her. Garza said he then "blacked out" and was "in a daze." He told the detectives he did not remember seeing a man at the house, but that the woman who had originally answered the door charged at him with a knife and he shot at her. At some point someone shot at him; he felt a "sting" in his arm and returned fire.

¶11 Garza was arrested and on December 2 made two phone calls from jail to Laurel Thompson. In the first conversation, Garza said he was "going to be here [in jail] for a couple years" and that he "did to someone else" what the two had discussed doing to a boyfriend who had assaulted Thompson.

¶12 In the second conversation, Thompson told Garza that he was on every newscast. Thompson asked Garza how he got caught; he told her, "I got shot." Garza questioned Thompson

4

about the news coverage and their friends' reaction to it. Garza asked her how many victims were being reported, and she said that he had killed two people. Garza told Thompson that he did not remember whom he shot, and they both chuckled. When asked whether it was self-defense, Garza said, "On one count it was, on one count it wasn't . . . . The guy shot me, then I shot him."

¶13    Garza's car was searched on December 4. Two white cloth gloves were found on the front seat floorboards. One glove was stained with blood, later identified through DNA testing as Garza's. Under the front seat was a bloodstained green cloth glove. DNA testing also identified that blood as Garza's. Garza's blood was also found on the passenger side of the car and in two locations in the hallway of the Waddell house.

¶14    A box of 9 mm ammunition was found under the driver's seat; Garza's fingerprints were on the box. These bullets were the same type as those found at the murder scene. A 9 mm pistol was found in Garza's belongings at his apartment; testing showed that the pistol had fired the bullets found at the murder scene. No bullets fired by any other gun were discovered at the scene, which suggests that Garza's wound came from his own gun.

¶15    Farley identified Garza at trial as the intruder. Eric Rodriguez, a longtime friend of Garza's, testified that

before the murders he rejected Garza's offer to join him in a venture that would require that they "get a little dirty" in order to make some money. Charles Guest, a more recent acquaintance, testified that two or three weeks before the murders Garza asked if he was interested in helping Garza with some "family problems."

### C.

¶16 Garza's primary defense at trial was that Larry had committed the murders. He claimed that law enforcement covered up Larry's involvement because Larry was a police informant. The jury found Garza guilty of two counts of first degree murder and one count of first degree burglary, a dangerous offense. The State alleged both felony and premeditated murder; the jury made no findings as to the theory or theories upon which the murder verdicts were based.

¶17 In the aggravation phase, the jury unanimously rejected the A.R.S. § 13-703(F)(5) (Supp. 2006)[3] pecuniary gain aggravator, but unanimously found the A.R.S. § 13-703(F)(8) multiple murders aggravator as to both murders. The jury also made *Enmund/Tison* findings in the aggravation phase.[4] The jury

---

[3] Sections 13-703 and -703.01 (Supp. 2006) were amended after Garza's trial, but not in any respect material to this case. This opinion therefore cites to the current versions of these statutes.

[4] "The Eighth Amendment does not allow the death penalty to

6

found that Garza had attempted to kill Ellen, was a major participant in the burglary, and had acted with reckless indifference for human life in her murder. The jury also found that Garza had killed Rush, had attempted to kill Rush, had intended to kill Rush, was a major participant in the burglary, and had acted with reckless indifference for human life.

¶18    In the penalty phase, the jury declined to impose death for the murder of Ellen, but authorized the death penalty for the murder of Rush. The superior court subsequently sentenced Garza to death for the murder of Rush and to life without possibility of parole for the murder of Ellen.[5]

## II. ISSUES ON APPEAL

### A. Jury Selection

### 1. Voir dire.

¶19    Garza makes four arguments regarding voir dire: (1) allowing the State to speak first in every voir dire session improperly implied that the prosecutors were the authority

---

be imposed on a defendant unless he either himself kills, attempts to kill, or intends that a killing take place . . . or is a major participant in the crime and acts with reckless indifference." *State v. Ellison*, 213 Ariz. 116, 134 ¶ 71, 140 P.3d 899, 917 (alterations and quotation marks omitted) (citing *Enmund v. Florida*, 458 U.S. 782, 797 (1982), and *Tison v. Arizona*, 481 U.S. 137, 157-58 (1987)), *cert. denied*, 127 S. Ct. 506 (2006). The trier of fact makes *Enmund/Tison* findings in the aggravation phase. A.R.S. § 13-703.01(P).

[5]    Garza was sentenced to twenty-one years in prison for burglary.

7

figures in the courtroom; (2) the prosecutor's statements unfairly biased the jury pool; (3) questioning whether prospective jurors could "follow the law" improperly signaled that a capital sentence was required upon conviction; and (4) the one-hour time limit initially imposed on defense voir dire of each panel of twenty-four prospective jurors denied Garza due process.

¶20    With the exception of the time limit, Garza raised no objections at trial to the voir dire process.  We therefore review his other arguments for fundamental error.  *State v. Glassel*, 211 Ariz. 33, 53 ¶ 76, 116 P.3d 1193, 1213 (2005), *cert. denied*, 126 S. Ct. 1576 (2006).[6]  To establish fundamental error, a defendant must prove "error going to the foundation of the case" and resultant prejudice.  *State v. Henderson*, 210 Ariz. 561, 567 ¶¶ 19-20, 115 P.3d 601, 607 (2005) (quotation marks omitted).

---

[6]    Garza claims that the allegedly constitutionally deficient voir dire was structural error.  Structural error, however, is limited to error which unfairly "deprive[s] defendants of basic protections," and therefore is limited to such circumstances as denial of counsel or a biased trial judge.  *State v. Ring*, 204 Ariz. 534, 552-53 ¶¶ 45-46, 65 P.3d 915, 933-34 (2003) (quotation marks omitted).  None of Garza's alleged voir dire errors fall into any recognized structural error category or "infected the entire trial process from beginning to end." *Id.* at 552-53 ¶ 46, 65 P.3d at 933-34 (internal quotation marks omitted).

### a. The State speaking first.

¶21     Arizona law does not require that the defense speak before the state in voir dire.  Arizona Rule of Criminal Procedure 18.5(d) simply allows for examination of jurors by counsel for both sides after examination by the court. Traditionally prosecutors speak to the panel first during voir dire because the state has the burden of proof and presents its case first during trial.  *See* Ariz. R. Crim. P. 19.1(a) (governing order of proof during trial).  Garza has not demonstrated that the superior court abused its discretion in following this standard procedure, much less that it committed fundamental error.  *See State v. Johnson*, 212 Ariz. 425, 435 ¶ 35, 133 P.3d 735, 745 (noting trial court's discretion in conducting voir dire), *cert. denied*, 127 S. Ct. 559 (2006); *State v. Clabourne*, 142 Ariz. 335, 344, 690 P.2d 54, 63 (1984) (same).

### b. The State's statements.

¶22     Garza's arguments about improper statements during the State's voir dire are directed toward comments such as these:

> Mr. Barry:  At the outset I want to tell you that as an attorney for the State I have a sworn duty to ensure that the record shows that every juror is fair and impartial.  That's our job, and that's what we're here to do.  That means that I must ensure that every juror is going to follow the law as Judge Martin instructs you.  Now, does everybody agree to be fair?

¶23     Garza claims that such comments were "impermissible prosecutorial vouching." Prosecutorial vouching occurs "when the prosecutor places the prestige of the government behind its witness," or "where the prosecutor suggests that information not presented to the jury supports the witness's testimony." *State v. Dumaine*, 162 Ariz. 392, 401, 783 P.2d 1184, 1193 (1989). The comments cited by Garza do not meet this description, but rather simply describe the role of the prosecutor in jury selection.

**c.    "Follow the law" questioning.**

¶24     Garza's argument that the superior court committed fundamental error by allowing the State to pose "follow the law" questions also is without merit. The state may properly inquire if jurors will follow the law. *See, e.g.*, *State v. Roque*, 213 Ariz. 193, 204 ¶ 17, 141 P.3d 368, 379 (2006) (discussing importance of determining whether a prospective juror "will be able to follow the law").

¶25     Garza also claims that basic questions posed by the trial court as to whether jurors could be impartial violated the rule of *Morgan v. Illinois*, 504 U.S. 719 (1992). But *Morgan* contains no prohibition against such questioning; rather, it requires that, in evaluating a prospective juror's ability to be impartial, more detailed questioning of prospective jurors beyond such simple questions must also be allowed. *Id.* at 734-36; *see also State v. Smith*, ___ Ariz. ___, ___ ¶ 43, ___ P.3d

10

___, ___ (2007); *Johnson*, 212 Ariz. at 435 ¶ 33, 133 P.3d at 745.  The voir dire here complied with *Morgan*; Garza was allowed extensive oral questioning and had access to a twenty-four page questionnaire completed by all prospective jurors.

### d.   One-hour time limit.

¶26      Garza objected below to the time limit for voir dire initially imposed by the trial court; we therefore review this claim under a harmless error standard.  *Henderson*, 210 Ariz. at 567 ¶ 18, 115 P.3d at 607.

¶27      The venire was divided into four panels of twenty-four, with one panel questioned at a time.  The parties initially agreed to limit questioning of each panel to one hour per side, but after the first panel was questioned Garza complained about the time limit.  The trial court subsequently recalled the first panel for unlimited further questioning and imposed no time limit for the other panels.  The trial court thus cured any conceivable error arising from the initial time limit.

### 2.   "Death presumptive" jurors.

¶28      Although he did not object to Jurors 4, 7, and 17 at trial, Garza claims that the superior court committed fundamental error in failing to exclude them sua sponte.  *See State v. Bible*, 175 Ariz. 549, 573, 858 P.2d 1152, 1176 (1993) (holding that review for failure to exclude a juror is for

fundamental error in the absence of objection). Garza claims that each prospective juror was biased in favor of the death penalty.

¶29 The record directly contradicts these claims. Indeed, Garza's trial counsel candidly admitted that he could not challenge Juror 4 for cause because the juror indicated in questioning that he did not believe that the death penalty was always appropriate. Juror 7 similarly indicated he was open-minded about whether to impose the death penalty, depending upon the circumstances of the case. And, Juror 17 stated that his opinion about the death penalty "depends on the facts" of a particular case and "on the individual."[7]

### 3. The State's peremptory strikes.

¶30 Garza argues that the State used peremptory strikes against three jurors because of their religious beliefs, violating the rule of *Batson v. Kentucky*, 476 U.S. 79 (1986). Under *Batson*: "(1) the party challenging the strikes must make a prima facie showing of discrimination; (2) the striking party must provide a [non-discriminatory] reason for the strike; and

---

[7] Garza also argues that Juror 3 should not have been excused. Defense counsel, however, agreed that this juror should be excused for hardship; the trial court then excused the juror. Any possible objection to the juror was therefore waived. *See State v. Tucker*, ___ Ariz. ___, ___ ¶ 14, ___ P.3d ___, ___ (2007) (finding no fundamental error when juror with qualms about death penalty was excused by agreement of counsel).

12

(3) if a [non-discriminatory] explanation is provided, the trial court must determine whether the challenger has carried its burden of proving purposeful . . . discrimination." *Roque*, 213 Ariz. at 203 ¶ 13, 141 P.3d at 378 (quotation marks omitted).

**¶31** Garza raised no *Batson* challenge to these three strikes at trial.[8] The State thus had no opportunity to give neutral explanations, and Garza has waived any *Batson* arguments. *State v. Cruz*, 175 Ariz. 395, 398, 857 P.2d 1249, 1252 (1993); *State v. Holder*, 155 Ariz. 83, 85, 745 P.2d 141, 143 (1987).

**4.   Denial of challenges for cause.**

**¶32** Garza claims that nine jurors against whom he used peremptory strikes should have been dismissed for cause. A defendant's use of peremptory strikes to remove prospective jurors who should have been removed for cause is subject to harmless error review. *State v. Hickman*, 205 Ariz. 192, 197 ¶ 22, 68 P.3d 418, 423 (2003). Reversal is not required if a fair and impartial jury was ultimately empanelled. *Id.* ¶ 23. Garza has not demonstrated that the jury eventually empanelled here was not impartial. Indeed, defense counsel's failure to use his remaining peremptory strike is evidence to the contrary.

---

[8]   Garza made a *Batson* challenge to the striking of another juror. The State articulated several grounds for the strike and the trial court denied the challenge. Garza does not contend on appeal that this ruling was erroneous.

13

## B. Guilt Phase Issues

### 1. Failure to disclose allegedly exculpatory material.

¶33    Garza alleges that the State improperly withheld evidence about Larry Franco's history as a confidential informant ("CI") for MCSO and the Arizona Department of Public Safety ("DPS").  "[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or punishment . . . ."  *Brady v. Maryland*, 373 U.S. 83, 88 (1963).

#### a. MCSO records.

¶34    Garza has not demonstrated that any MCSO records were withheld.  After an MCSO deputy testified that forms concerning Larry's service as a CI in 1994 were not in previously disclosed materials, Garza asked the trial court to order disclosure of all MCSO files.  The State replied that everything had already been disclosed and suggested that the missing records may have been purged.  The trial court then ordered the State to ensure complete disclosure.  The MCSO files were never again discussed on the record.  Thus, nothing in the record indicates that additional MCSO documents regarding Larry exist.

#### b. DPS records.

¶35    Larry served as a CI for DPS in undercover drug operations in the early 1990s.  Garza moved before trial for discovery of any DPS records on Larry.  The superior court

14

denied the motion. We review such discovery rulings for abuse of discretion. *Roque*, 213 Ariz. at 205 ¶ 21, 141 P.3d at 380.

¶36 The superior court did not abuse its discretion here. Larry's relationship with DPS had ended years before the murders, and Garza made no showing that DPS was involved in the investigation of the murders. In any event, Garza established through the testimony of a DPS detective that Larry was an informant during the early 1990s.

**2. Admission of the jailhouse telephone conversations.**

¶37 Garza argues that one of the taped phone conversations with Laurel Thompson was improper "character evidence." We review evidentiary rulings for abuse of discretion. *State v. Ellison*, 213 Ariz. 116, 129 ¶ 42, 140 P.3d 899, 912, *cert. denied*, 127 S. Ct. 506 (2006).

¶38 In the conversation, Thompson asked Garza what he did to get arrested. Garza replied, "Well, remember what you wanted me to do when that one guy beat you up? . . . Well, I did it to somebody else." Garza alleges that this statement was irrelevant and improperly used to show that he had a propensity for violence. These arguments fail.

¶39 The statement is relevant because it is probative of Garza's consciousness of guilt. The statement's probative value is not substantially outweighed by any prejudice that might have resulted from Garza's suggestion that Thompson had previously

15

asked him to engage in similar conduct in the past. By its own terms, the statement implies that no previous assault occurred; Garza merely said that Thompson had once suggested some course of action.

¶40    Nor was the statement offered to show Garza's bad character or propensity for violence. The superior court instructed the jury that "[e]vidence of other acts of the defendant" could be considered "only as it relates to the defendant's intent, plan, knowledge, or identity." *See* Ariz. R. Evid. 404(b) (permitting use of prior acts evidence for such purposes).

¶41    Garza also argues that the statement should have been excluded because its "trustworthiness" was not independently corroborated. The statement, however, was a *party admission* under Arizona Rule of Evidence 801(d)(2)(A). Party admissions require no external indicia of reliability. *See State v. Nordstrom*, 200 Ariz. 229, 248 ¶ 55, 25 P.3d 717, 736 (2001).[9]

## 3.    Jury instructions.

¶42    Garza raises three claims as to the guilt phase jury instructions: (1) the court erred in giving the State's

---

[9]    In contrast, *statements against interest* by unavailable non-party declarants, which are governed by Rule 804(b)(3), are admissible only if there is some external evidence of reliability. *See State v. Tankersley*, 191 Ariz. 359, 370 ¶ 45, 956 P.2d 486, 497 (1998).

requested instruction on accomplice liability both because the State's theory at trial was that Garza acted alone and because the request was untimely; (2) a "mere presence" instruction should have been given; and (3) the standard "absence of other participant" instruction should not have been given. We review these rulings for abuse of discretion. *Johnson*, 212 Ariz. at 431 ¶ 15, 133 P.3d at 741.

¶43    Each claim fails to withstand analysis. Contrary to Garza's argument, the accomplice liability instruction was proposed by the court, not the State.[10] Whatever its provenance, the instruction was appropriate. Garza's blood was found on the passenger side of his car, suggesting that someone else drove the car away from the crime scene; the defense argued that this person committed the murders.

¶44    Garza's argument that a "mere presence" jury instruction was denied is also not accurate. The jury was so instructed in accordance with Revised Arizona Jury Instruction ("RAJI") (Criminal) 31 (Supp. 2000). Nor did the court err in giving an "absence of other participant" instruction. *See* RAJI (Criminal) 12. The charge was appropriate because Garza's counsel claimed that Larry was involved in the murders.

---

[10]    The State did not submit instructions in the guilt phase. In fact, Garza proposed an accomplice liability instruction, albeit one narrower than that given.

17

**4.    Reasonable doubt instruction.**

¶45      Garza alleges that the court improperly instructed the jury on reasonable doubt.    The instruction, however, was consistent with *State v. Portillo*, 182 Ariz. 592, 594-96, 898 P.2d 970, 972-74 (1995).    We have "reaffirmed a preference for the *Portillo* instruction" and rejected the invitation to revisit *Portillo*.    *Ellison*, 213 Ariz. at 133 ¶ 63, 140 P.3d at 916 (internal quotation marks omitted).

**5.    *Enmund/Tison* findings.**

¶46      Garza argues that having the jury make *Enmund/Tison* findings in the aggravation phase rather than the guilt phase violates the Sixth Amendment.    We have specifically rejected, however, the argument that the Sixth Amendment requires a jury, rather than a judge, to make such findings.    *State v. Ring*, 204 Ariz. 534, 563-65 ¶¶ 97-101, 65 P.3d 915, 944-46 (2003).    Thus, there was no Sixth Amendment violation.    Nor was there any statutory error.    Arizona law specifically requires the trier of fact to make *Enmund/Tison* findings in the aggravation phase. A.R.S. § 13-703.01(P) (Supp. 2006).[11]

---

[11]    Garza also argues that the jury should have been required to make separate findings as to premeditated and/or felony murder.    As we have emphasized, this is the better practice. *State v. Smith*, 160 Ariz. 507, 513, 774 P.2d 811, 817 (1989). But the argument that separate findings are constitutionally required was rejected in *Schad v. Arizona*, 501 U.S. 624, 645 (1991).    We recently reaffirmed *Schad*'s application to Arizona's

18

## C. Sentencing Phase Issues

### 1. Failure to allege specific aggravating factors in the indictment and notice of intent to seek the death penalty.

¶47      Garza contends that the State's failure to allege specific aggravating factors in the indictment deprived him of due process.  Garza concedes, however, that *McKaney v. Foreman ex rel. County of Maricopa*, 209 Ariz. 268, 100 P.3d 18 (2004), forecloses this argument.

¶48      Approximately one month after the indictment, the State filed a notice simply stating its intent "to prove one or more of the enumerated factors contained in A.R.S. § 13-703(F)."  Garza argues that the notice violated Arizona Rule of Criminal Procedure 15.1(i)(2), which now requires notice of specific alleged aggravating circumstances to be provided no later than sixty days after arraignment.

¶49      The current version of Rule 15.1, however, applies "only to cases in which the charging document was filed on or after December 1, 2003."  *State v. Anderson*, 210 Ariz. 327, 347 n.13 ¶ 79, 111 P.3d 369, 389 (2005).  Garza was indicted in December 1999 and received notice of specific aggravators in 2002, almost two years before his trial began.  This complied with the version of Rule 15.1 in effect at the time, *see* Ariz.

---

new jury sentencing scheme.  *State v. Gomez*, 211 Ariz. 494, 498 n.3 ¶ 16, 123 P.3d 1131, 1135 (2005).

R. Crim. P. 15.1(g)(2)(a) (1999) (requiring list of alleged aggravating factors no later than ten days after guilty verdict), and Garza has not demonstrated prejudice from the timing of the notice. *See Anderson*, 210 Ariz. at 347 ¶ 80, 111 P.3d at 389 (holding defendant not denied due process when he received notice of aggravators one year before aggravation phase).

### a. Lack of probable cause finding for aggravators.

**¶50** Garza claims that he was deprived of due process because no finding of probable cause was made with respect to aggravating factors. As Garza acknowledges, we have rejected this argument. *McKaney*, 209 Ariz. at 272 ¶¶ 16-17, 100 P.3d at 22; *see also State v. Hampton*, 213 Ariz. 167, 174 ¶ 26, 140 P.3d 950, 957 (2006), *cert. denied*, 127 S. Ct. 972 (2007).

### b. The (F)(5) aggravator.

**¶51** The jury was instructed on two aggravating factors: pecuniary gain, A.R.S. § 13-703(F)(5), and multiple homicides, A.R.S. § 13-703(F)(8). The jury did not find the (F)(5) factor, but Garza argues that merely submitting this aggravator to the jury was error because there was no evidence to support it.

**¶52** It is difficult to see how Garza could have suffered any prejudice from the submission of the (F)(5) aggravator to the jury, given the panel's failure to find the aggravator. In any event, the superior court did not err in denying Garza's

20

motion under Arizona Rule of Criminal Procedure 20 to dismiss the aggravator. A Rule 20 motion must be denied if there is "substantial evidence" to support the alleged aggravator. *Ellison*, 213 Ariz. at 134 ¶ 65, 130 P.3d at 917. To establish the (F)(5) aggravator, "the state must prove that the murder would not have occurred but for the defendant's pecuniary motive." *Ring*, 204 Ariz. at 560 ¶ 75, 65 P.3d at 941. There was evidence here of a financial motive to kill Ellen -- a witness testified that Garza asked him to help with a "dirty job" in return for compensation.

**2. Alleged comment on Garza's failure to testify.**

¶53 Garza accuses the State of improperly commenting on his failure to testify. Because Garza did not object below, we review for fundamental error. *State v. Decello*, 113 Ariz. 255, 258, 550 P.2d 633, 636 (1976).

¶54 Garza focuses on two comments in the penalty phase closing arguments. The first described the night in question and the terror that must have been experienced by the victims. In contrast, the prosecutor claimed, "Ruben Garza . . . didn't care. He cared only about himself. He didn't call 911." This statement did not relate to Garza's failure to testify at trial, but rather to the events of December 1, 1999, and Garza's inaction on that date.

21

¶55    The second comment came during the State's discussion

of the defense theory that Larry committed the murders:

> [Y]ou've listened to the interview of Ruben Garza.
> We've played that interview for you.  If it was Larry
> Franco, why didn't he tell us that?  In fact, he had
> the opportunity to tell us that back on December 2nd,
> 1999, while the detectives were investigating this
> case . . . . Why didn't the defendant tell us that
> back in December when at the moment of truth is so
> critical, when we had the chance to further
> investigate[?]

Again, this statement was aimed at Garza's statements to the

police, not at his failure to testify at trial.  *See State v.*

*Rutledge*, 205 Ariz. 7, 13 ¶ 33, 66 P.3d 50, 56 (2003)

(upholding, against Fifth Amendment attack, comments that did

not "naturally and necessarily . . . comment on the defendant's

failure to testify").

**3.   Use of 911 recordings in the penalty phase.**

¶56    Garza claims that the 911 tape should not have been

admitted in the penalty phase.  We review rulings admitting

evidence in that phase for abuse of discretion.  *State v.*

*McGill*, 213 Ariz. 147, 156 ¶ 40, 140 P.3d 930, 939 (2006), *cert.*

*denied*, 127 S. Ct. 1914 (2007).

¶57    The 911 tape was admitted in the guilt phase without

objection.  Because the penalty phase jury was the same one that

determined guilt, all evidence from the guilt phase was "deemed

admitted" in the penalty phase.  A.R.S. § 13-703.01(I).  In any

event, because the jury may consider the circumstances of the

22

crime in its evaluation of mitigation, *see* A.R.S. § 13-703(G), the 911 tape was relevant to the issues faced by the trier of fact in the penalty phase.

**4.    The penalty phase closing argument.**

¶58      At the beginning of his closing, the prosecutor argued:

> You know, listening to [counsel for Garza in his closing argument], I want to apologize at the outset, because when he stood up here and tried to in some way insinuate or suggest to you that the suffering of these people over here, the suffering of the victims is somehow comparable to Ruben Garza and the life he's led.  That deserves an apology.  I was shocked to hear that this morning.  There is no way that Ruben Garza and the opportunities he's had in his life is comparable in any way to what these people have gone through in the last five years to see that justice is done in this case, the loss of their son, the loss of their daughter.  So we want to apologize at the outset.  I know [Garza's counsel] really didn't mean to do that.

The State ended its argument on a similar note:

> And in the defense's opening he suggested that it was unfortunate that the victims were here in the courtroom.  The families of these victims were here because of the decisions that Ruben made.  They seek justice for the brutal murders of their son and daughter, and this case cries out for justice and asks that you follow the law and impose the death penalty in this case.

Garza claims that these comments were improper, but did not object to them below; we therefore review for fundamental error. *Roque*, 213 Ariz. at 228 ¶ 154, 141 P.3d at 403.

23

¶59    The arguments were not fundamental error.  In his argument, defense counsel had sought to compare the suffering of the murder victims with that of Garza and his loved ones.  The State's commentary was invited by this argument.

**5.    Victim impact statements and accompanying photos.**

¶60    Garza argues that the victim impact evidence was unduly prejudicial in two respects.  The admission of victim impact evidence is reviewed for abuse of discretion.  *Ellison*, 213 Ariz. at 141 ¶ 115, 140 P.3d at 924; *see also Hampton*, 213 Ariz. at 181 ¶ 58, 140 P.3d at 964 (holding that victim impact evidence cannot be "so unduly prejudicial that it renders the trial fundamentally unfair" (quotation marks omitted)).[12]

**a.    Comparison to 9/11 attacks.**

¶61    Ida LaMere, Ellen's mother, discussed the family's feelings of loss as follows:

> We know death is inevitable, disease, accidents, old age, wars, but not like this.  There really aren't any words to express the horror and devastation of a 4:00 a.m. phone call telling me my baby has been shot to death along with her friend.  The best I can compare this to is what you all might have felt the day of September 11 when the horrible, devastating attacks to New York and Washington, D.C. happened, and always

---

[12]    Garza also argues that victim impact evidence was improperly admitted because it did not rebut any specific fact in mitigation.  Victim impact statements, however, are generally relevant to rebut mitigation.  *Hampton*, 213 Ariz. at 181 ¶ 58, 140 P.3d at 964; *Ellison*, 213 Ariz. at 140-41 ¶ 111, 140 P.3d at 923-24.

24

living in the fear that you just don't know what is going to happen any more.

¶62 This statement was not unduly prejudicial. LaMere drew a comparison between an event universally painful for all Americans and the pain she and her family experienced as a result of Ellen's murder. She did not equate Garza to the 9/11 terrorists; rather, her statement properly "focuse[d] on the effect of the crime on the victim and the victim's family." *Roque*, 213 Ariz. at 221 ¶ 114, 141 P.3d at 396.[13]

   **b. Photographs of the victims.**

¶63 LaMere and Brenda Rush, Lance's mother, each displayed photographs of Ellen and Lance during their statements. We have "recognize[d] the danger that photos of victims may be used to generate sympathy for the victim and his or her family," but we have declined to categorically bar their use, relying upon the discretion of the trial court to prevent undue prejudice. *Ellison*, 213 Ariz. at 141 ¶ 115, 140 P.3d at 924. The superior court did not abuse its discretion here. The photographs

---

[13] Garza also claims that it was structural error to permit the victims' statements at the onset of the penalty phase. Arizona Rule of Criminal Procedure 19.1(d), however, expressly provides for victim impact statements after opening statements and before the defense's mitigation evidence. The State offered to stipulate to the introduction of victim impact statements after Garza's presentation of mitigation evidence, but defense counsel specifically requested that the court follow the order of presentation specified in Rule 19.1(d).

depicted the lives of the murder victims and thus supported the statutory victims' descriptions of their losses.

## 6. Allocution.

¶64     Garza argues he was denied his right to allocution under Arizona Rule of Criminal Procedure 19.1(d)(7) because the trial court indicated it might allow the State to cross-examine him or comment on any statements he made. When the question of allocution first arose, the State contended that cross-examination or comment should be permitted if allocution statements went beyond a "plea for mercy" to "dispute evidence presented by the State." *State v. Lord*, 822 P.2d 177, 217 (Wash. 1991) (allowing cross-examination after allocution that disputed guilt). The trial court never ruled on this point, but did suggest that if Garza went "beyond what is contemplated in allocution, he might be subject to cross." Garza did not allocute.

¶65     Because Garza declined to allocute or make a record as to what his allocution would have been, he cannot now claim prejudice from the trial court's tentative comments. *See Anderson*, 210 Ariz. at 350 ¶ 100, 111 P.3d at 392 (holding that even when allocution is denied "there is no need for resentencing unless the defendant can show that he would have added something to the mitigating evidence already presented" (quotation marks omitted)); *see also State v. Tucker*, ___ Ariz.

26

___, ___ ¶ 79, ___ P.3d ___, ___ (2007) (holding that defendant who chose not to allocute could not object on appeal to trial judge's suggestion that cross-examination was possible).

### 7. Instruction that life is the presumptive sentence.

¶66        Garza argues that the trial court should have instructed the jury that the presumptive sentence for Rush's murder was life.  Once aggravating circumstances are proved, however, neither the state nor the defendant has the burden of proof with regard to whether the mitigation is sufficiently substantial to call for leniency.  *State ex rel. Thomas v. Granville* (*Baldwin*), 211 Ariz. 468, 472 ¶ 17, 123 P.3d 662, 666 (2005) (noting that "neither party bears the burden" of persuasion in the penalty phase).  Rather, it is each juror's duty to consider the aggravation and mitigation and make a discretionary sentencing decision.  *Id.* ¶ 14; *see also Hampton*, 213 Ariz. at 180 ¶ 54, 140 P.3d at 963.[14]

### 8. Denial of a jury instruction on residual doubt.

¶67        Garza contends that the trial court abused its discretion by denying his request for a penalty phase instruction allowing the jury to consider as a mitigating

---

[14]    The trial court actually erred in Garza's favor by instructing the jury that any doubt as to the appropriate sentence should be resolved in favor of a life sentence. "[S]uch an instruction is improper." *Baldwin*, 211 Ariz. at 474 ¶ 23, 123 P.3d at 668.

circumstance residual doubt that he committed the murders. There is, however, "no constitutional requirement that the sentencing proceeding jury . . . consider[] evidence of 'residual doubt.'" *Ellison*, 213 Ariz. at 136 ¶ 82, 140 P.3d at 919 (quoting *Oregon v. Guzek*, 126 S. Ct. 1226, 1230-32 (2006)). Nor does Arizona law require such an instruction. *See Anderson*, 210 Ariz. at 348 ¶ 86, 111 P.3d at 390 ("During the . . . penalty phase[], a jury may not revisit its initial guilty verdict.").

**9.    Denial of a third-party culpability instruction.**

¶68     Garza claims that the penalty phase jury was improperly instructed on possible third-party culpability. The jury, however, was instructed that it could consider as a mitigating circumstance evidence that "[t]he defendant was legally accountable for the conduct of another as an accomplice but his participation was relatively minor, although not so minor as to constitute a defense to prosecution." This instruction tracks the language of A.R.S. § 13-703(G)(3) and appropriately allowed the jury to consider Garza's level of culpability as mitigation.

**10. Instructing the jury not to consider sympathy or sentiment.**

¶69     The jury was instructed twice in the penalty phase not to be swayed by sentiment, passion, prejudice, or public feeling or opinion.    Although Garza concedes that these instructions

28

were proper under both *California v. Brown*, 479 U.S. 538, 541-43 (1987), and *Saffle v. Parks*, 494 U.S. 484, 487-95 (1990), he argues that those cases are inapposite because they were decided prior to Arizona jury sentencing in capital cases. We have rejected this argument. *Anderson*, 210 Ariz. at 349 ¶ 92, 111 P.3d at 391; *State v. Carreon*, 210 Ariz. 54, 70-71 ¶¶ 81-87, 107 P.3d 900, 916-17 (2005).

**11. Instruction that the jury must unanimously determine that mitigation is sufficiently substantial to call for leniency.**

**¶70** Garza argues that requiring the jury to unanimously agree that mitigation is sufficiently substantial to call for leniency violates *Mills v. Maryland*, 486 U.S. 367 (1988). "*Mills* . . . forbids states from imposing a requirement that the jury find a potential mitigating factor unanimously before that factor may be considered in the sentencing decision." *Beard v. Banks*, 542 U.S. 406, 408-09 (2004).

**¶71** The instructions given here -- which are consistent with A.R.S. §§ 13-703(C) and -703.01(H) -- complied with *Mills*. In contrast to the instructions in *Mills*, the charge here made clear that, although the jury must unanimously determine that the death penalty is not appropriate, it need not unanimously find the existence of any particular mitigator.[15] *See Anderson*,

---

[15] The trial court instructed the jury as follows:

29

210 Ariz. at 350 ¶ 99, 111 P.3d at 392 (upholding similar instructions).

## 12. A.R.S. § 13-703 creates an unconstitutional presumption of death.

**¶72**     Garza claims that A.R.S. §§ 13-703(E) and -703.01(H) create an unconstitutional presumption of death. We have repeatedly rejected this argument. *See, e.g.*, *Glassel*, 211 Ariz. at 52 ¶ 72, 116 P.3d at 1212; *Anderson*, 210 Ariz. at 346 ¶ 77, 111 P.3d at 388.

---

The determination of what circumstances are mitigating and the weight to be given to any mitigation is for each of you to resolve, individually, based upon all the evidence presented during all phases of this trial.

. . . .

A finding that a particular mitigating circumstance exists need not be unanimous, that is you all need not agree on what particular mitigation exists.

. . . .

If you unanimously find that no mitigation exists then you must return a verdict of death. If you unanimously find that mitigation exists, you should weigh the mitigation in light of the aggravating circumstances already found to exist, and if you unanimously find that the mitigation is not sufficiently substantial to call for a sentence of imprisonment for life, you must return -- you must return a verdict of death.

If you unanimously find that mitigation exists and it is sufficiently substantial to call for a sentence of imprisonment for life, you must return a verdict of life.

30

## D. Constitutional Challenges to the Death Sentence

¶73      In order to preserve them for federal review, Garza raises fourteen constitutional claims about the death penalty. These claims, and citations to cases that Garza acknowledges have rejected his arguments, are repeated verbatim in the Appendix.

## III. INDEPENDENT REVIEW

¶74      Garza did not argue, either in his appellate briefing or at oral argument, that there were "mitigating circumstances sufficiently substantial to call for leniency," A.R.S. § 13-703(E), and that the jury therefore should not have imposed the death penalty for the murder of Rush once it found an aggravating circumstance. Although we should have been aided by argument of counsel on this point,[16] A.R.S. § 13-703.04 (Supp. 2006) nevertheless mandates that we review the evidence of aggravating and mitigating circumstances and independently

---

[16]      Death penalty counsel "at every stage of the case should take advantage of all appropriate opportunities to argue why death is not suitable punishment for their particular client," *ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases* Guideline 10.11(L) (2003), and should not simply rely upon this Court's statutory duty to review the record. *See also id.* 10.15.1(C) (noting duty of defense counsel to "seek to litigate all issues . . . that are arguably meritorious"); *id.* 1.1 cmt. ("Appellate counsel must be intimately familiar with . . . the substantive state, federal, and international law governing death penalty cases . . . ."); *State v. Morris*, ___ Ariz. ___, ___ n.10 ¶ 76, ___ P.3d ___ (2007) (noting counsel's duties under ABA Guidelines).

determine whether death is the appropriate penalty.[17]  *State v. Cromwell*, 211 Ariz. 181, 191 ¶¶ 52-53, 119 P.3d 448, 458 (2005), *cert. denied*, 126 S. Ct. 2291 (2006); *Anderson*, 210 Ariz. at 354 n.21 ¶ 119, 111 P.3d at 396.

## A.    Aggravation

¶75      The jury found that "[t]he defendant has been convicted of one or more other homicides . . . that were committed during the commission of the offense."  A.R.S. § 13-703(F)(8).  The (F)(8) aggravator requires that a first degree murder and at least one other homicide be "temporally, spatially, and motivationally related . . . during 'one continuous course of criminal conduct.'"  *State v. Prasertphong*, 206 Ariz. 167, 170 ¶ 15, 76 P.3d 438, 441 (2003) (quoting *State v. Rogovich*, 188 Ariz. 38, 45, 932 P.2d 794, 801 (1997)).

---

[17]    Because the murders were committed before August 1, 2002, independent review is required. *See* A.R.S. § 13-703.04; Ariz. Sess. Laws, 5th Spec. Sess., ch. 1, § 7(B) (2002).  Our power of independent review extends only to the death sentence imposed for the murder of Lance Rush and not to the life sentence for the murder of Ellen Franco.  Garza does not argue that the sentences are inconsistent, nor can we so conclude.  Although the aggravating circumstance for each murder was identical, the jury was allowed to consider the circumstances of the crimes in mitigation.  A.R.S. § 13-703(G).  The *Enmund/Tison* findings indicate that the jury believed that Garza intended to kill Rush but was not convinced beyond a reasonable doubt that he had intended to kill Ellen.  There was substantial evidence to support such a distinction.  Ellen was shot in the living room and Garza could have easily escaped through the door to that room from which he entered the dwelling.  He nonetheless went down the hallway to the bedroom, apparently seeking an encounter with other residents of the house.

¶76     The (F)(8) aggravator was correctly found here with respect to Rush's murder.  The second victim, Ellen, was in the same house and was shot moments before Rush; the two murders were indisputably temporally and spatially related.  The two homicides were also motivationally related.  *See State v. Dann*, 206 Ariz. 371, 374 ¶ 10, 79 P.3d 58, 61 (2003) ("[I]t was 'difficult to imagine a motive for the killings unrelated to the murder of [the girlfriend].'") (quoting *State v. Tucker*, 205 Ariz. 157, 169 ¶ 66, 68 P.3d 110, 122 (2003)).

## B.    Mitigation Evidence

¶77     Our review of the record suggests three possible mitigating factors.

¶78     First, Garza was nineteen years old at the time of the murders.  Under A.R.S. § 13-703(G)(5), the defendant's age is a mitigating circumstance.

¶79     Second, Garza called twenty-seven friends and family members to testify in the penalty phase as to his good character and absence of prior criminal behavior.  Most of them used some version of the word "shocked" to describe their reaction to finding out that Garza had been arrested for the murders.

¶80     Third, Garza presented evidence of alleged stress at the time of the murders.  His parents had recently divorced, a baby to whom he was to be the godfather had died in infancy the previous year, he had recently been attacked with a baseball bat

33

for intervening in a dispute between a man and his girlfriend, and he had learned only a week before the murders that a close friend had passed away from cancer. Garza had once attempted suicide by cutting his wrists, he talked of suicide on another occasion, and a suicide note was discovered after the murders.

## C. Propriety of the Death Sentence

¶81    In exercising our independent review, we must take into account both the aggravating and mitigating circumstances. A.R.S. § 13-703.04. We start from the premise that a finding of the (F)(8) aggravator, that the defendant has committed more than one murder in the commission of the offense, is entitled to "extraordinary weight." *Hampton*, 213 Ariz. at 185 ¶ 90, 140 P.3d at 968. We then consider whether any proved mitigation is "sufficiently substantial to warrant leniency." A.R.S. § 13-703.04(B).

¶82    Age is of diminished significance in mitigation when the defendant is a major participant in the crime, especially when the defendant plans the crime in advance. *State v. Poyson*, 198 Ariz. 70, 80-81 ¶¶ 37-39, 7 P.3d 79, 89-90 (2000); *State v. Jackson*, 186 Ariz. 20, 31, 918 P.2d 1038, 1049 (1996). Garza was a major participant in the murders; the evidence is overwhelming that he personally killed both victims. Moreover, at least the burglary was planned in advance. Garza obtained ammunition, brought gloves to the crime scene, and sought help

34

from at least two potential associates. The crime was thus not simply a case of "juvenile impulsivity," *Jackson*, 186 Ariz. at 31, 918 P.2d at 1049, and we therefore do not afford Garza's age substantial weight in mitigation. *See State v. Clabourne*, 194 Ariz. 379, 386 ¶ 29, 983 P.2d 748, 755 (1999) (holding that planning and major participation "weigh against age as a mitigating circumstance").

¶83 Similarly, a defendant's prior good deeds and character are entitled to less weight in mitigation when a crime is planned in advance. *State v. Willoughby*, 181 Ariz. 530, 548-49, 892 P.2d 1319, 1337-38 (1995). Moreover, evidence of family support is given reduced weight in mitigation when, as here, a murder victim was a relative of the defendant's family. *See State v. Williams*, 183 Ariz. 368, 385, 904 P.2d 437, 454 (1995).

¶84 Finally, although it appears that Garza had suffered some personal setbacks before the murders, nothing in the record links the stress from those events to the commission of these crimes. *See Roque*, 213 Ariz. at 230-31 ¶¶ 168, 170, 141 P.3d at 405-06 (reducing death sentence to life imprisonment where murder was committed by a defendant with mental illness distressed by the 9/11 attacks). This lack of a causal nexus diminishes the mitigating effect of this evidence. *See Hampton*, 213 Ariz. at 185 ¶ 89, 140 P.3d at 968; *Johnson*, 212 Ariz. at

35

440 ¶ 65, 133 P.3d at 750; *Anderson*, 210 Ariz. at 349-50 ¶¶ 93-97, 111 P.3d at 391-92.

¶85      Even assuming arguendo that Garza proved his prior good character and the existence of some difficult situations in his life, given the aggravating circumstance of two murders, we cannot conclude that the mitigation was sufficiently substantial to call for leniency.  We therefore affirm the death sentence for the murder of Lance Rush.

### IV.  CONCLUSION

¶86      For the reasons above, we affirm Garza's convictions and sentences.


_____
                    Andrew D. Hurwitz, Justice

CONCURRING:


_____
Ruth V. McGregor, Chief Justice


_____
Rebecca White Berch, Vice Chief Justice


_____
Michael D. Ryan, Justice


_____
W. Scott Bales, Justice

**Appendix**

1. The death penalty is *per se* cruel and unusual punishment. Both the United States Supreme Court and this Court have rejected this argument. *Gregg v. Georgia*, 428 U.S. 153, 207 (1976); *State v. Salazar*, 173 Ariz. 399, 411, 844 P.2d 566, 578 (1992); *State v. Gillies*, 135 Ariz. 500, 507, 662 P.2d 1007, 1014 (1983).

2. Execution by lethal injection is cruel and unusual punishment. This Court has previously determined lethal injection to be constitutional. *State v. Hinchey*, 181 Ariz. 307, 315, 890 P.2d 602, 610 (1994).

3. The statute unconstitutionally requires imposition of the death penalty whenever at least one aggravating circumstance and no mitigating circumstances exist. This Court has rejected this challenge. *State v. Bolton*, 182 Ariz. 290, 310, 896 P.2d 830, 850 (1995); *State v. Miles*, 186 Ariz. 10, 19, 918 P.2d 1028, 1037 (1996); *see also Walton v. Arizona*, 497 U.S. 639, 653 (1990).

4. The death statute is unconstitutional because it fails to guide the sentencing jury. This Court has rejected this claim. *State v. Greenway*, 170 Ariz. 155, 164, 823 P.2d 22, 31 (1991).

5. Arizona's death statute unconstitutionally requires defendants to prove that their lives should be spared. This Court rejected this claim in *State v. Fulminate*, 161 Ariz. 237, 258, 778 P.2d 602, 623 (1988).

6. The statute unconstitutionally fails to require either cumulative consideration of multiple mitigating factors or that the jury make specific findings as to each mitigating factor. This Court has rejected this claim. *State v. Gulbrandson*, 184 Ariz. 46, 69, 906 P.2d 579, 602 (1995); *State v. Ramirez*, 178 Ariz. 116, 131, 871 P.2d 237, 252 (1994); *State v. Fierro*, 166 Ariz. 539, 551, 804 P.2d 72, 84 (1990).

7. Arizona's statutory scheme for considering mitigating evidence is unconstitutional because it limits full consideration of that evidence. This Court has rejected that contention. *See State v. Mata*, 125 Ariz. 233, 242, 609 P.2d 48, 57 (1980).

8.  The statute is unconstitutional because there are no statutory standards for weighing. This was rejected in *State v. Atwood*, 171 Ariz. 576, 645 n.21, 832 P.2d 593, 662 (1992).

9.  Arizona's death statute insufficiently channels the sentencer's discretion in imposing the death sentence. This Court has rejected this. *State v. West*, 176 Ariz. 432, 454, 862 P.2d 192, 214 (1993), *overruled on other grounds by State v. Rodriguez*, 192 Ariz. 58, 961 P.2d 1006 (1995); *Greenway*, 170 Ariz. at 164, 823 P.2d at 31.

10. Arizona's death statute is unconstitutionally defective because it fails to require the state to prove that death is appropriate. This Court rejected this argument in *Gulbrandson*, 184 Ariz. at 72, 906 P.2d at 605.

11. The prosecutor's discretion to seek the death penalty unconstitutionally lacks standards. This Court has rejected a similar claim in *Salazar*, 173 Ariz. at 411, 844 P.2d at 578.

12. Death sentences in Arizona have been applied arbitrarily and irrationally and in a discriminatory manner against impoverished males whose victims have been Caucasian. This Court rejected the argument that the death penalty has been applied in a discriminatory manner in *West*, 176 Ariz. at 455, 862 P.2d at 214.

13. The Constitution requires a proportionality review of a defendant's death sentence. This Court rejected this argument. *See Salazar*, 173 Ariz. at 411, 844 P.2d at 578; *State v. Serna*, 163 Ariz. 260, 269-70, 787 P.2d at 1065-66 (1990).

14. There is no meaningful distinction between capital and non-capital cases. This was rejected in *Salazar*, 173 Ariz. at 416, 844 P.2d at 578.